[L.A. No. 31877. Sept. 26, 1985.]

CANDID ENTERPRISES, INC., Plaintiff and Respondent, v. GROSSMONT UNION HIGH SCHOOL DISTRICT et al., Defendants and Appellants.

**880**

**COUNSEL**

Donald E. Smallwood, Daniel A. Nordberg and Fiore & Nordberg for Defendants and Appellants.

Best, Best & Krieger, Dallas Holmes, Gregory V. Moser, Breon, Galgani, Godino & O'Donnell, Louis T. Lozano, Emi R. Uyehara, John A. Drummond, Lloyd M. Harmon, Jr., County Counsel (San Diego), Howard P. Brody, Chief Deputy County Counsel, William W. Taylor and Sandra J. Brower, Deputy County Counsel, · Robert A. Rundstrom, Kronick, Moskovitz, Tiedemann & Girard, Robert J. Henry and Jacqueline M. Gong as Amici Curiae on behalf of Defendants and Appellants.

Joel L. Incorvaia, Howard J. Barnhorst II, Stephanie Sontag Nance, Louise M. Quintard and Dorazio, Barnhorst, Goldsmith & Bonar for Plaintiff and Respondent.

Ronald A. Zumbrun, Robert K. Best, Mark A. Wasser and Timothy A. Bittle as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—The major question we must decide in this case concerns what are commonly referred to as "school-impact fees"—i.e., fees that local

governments impose on real property development to cover the costs of constructing and maintaining school facilities attributable to such development. The precise question is whether the School Facilities Act (sometimes hereafter the Act) (Gov. Code, § 65970 et seq.)[1]—which encourages local school boards to identify and local governments to deal with the problem of overcrowding, and to that end permits the imposition of school-impact fees to finance certain temporary facilities—preempts local governments from imposing such fees to finance both temporary and permanent facilities. We answer this question in the negative, and therefore reverse the judgment.

I

In California the financing of public school facilities has traditionally been the responsibility of local government. "Before the *Serrano* v. *Priest* decision in 1971, school districts supported their activities mainly by levying ad valorem taxes on real property within their districts." (Cal. Building Industry Assn., Financing School Facilities (Apr. 1983) p. 3 (hereafter Financing School Facilities).) Specifically, although school districts had received some state assistance since 1947, and especially since 1952 with the enactment of the State School Building Aid Law of 1952 (Ed. Code, § 16000 et seq.), they financed the construction and maintenance of school facilities mainly through the issuance of local bonds repaid from real property taxes.

After the *Serrano* decision (5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]) and to the present day, local government has remained primarily responsible for school facility financing, but has often been thrust into circumstances in which it has been able to discharge its responsibility, if at all, only with the greatest difficulty. In these years, the burden on different localities has been different: extremely heavy on those that have experienced growth in enrollment, light on those that have experienced decline, and somewhere in between on those that have remained stable.

In the early 1970's, because of resistance to increasing real property taxes, localities throughout the state began to experience greater difficulty in obtaining voter approval of bond issues to finance school facility construction and maintenance. As a result, a number of communities chose to impose on developers school-impact fees—such as those at issue here—in order to make new development cover the costs of school facilities attributable to

---

[1] Unless otherwise noted, all statutory references are to the Government Code.

it. (See, e.g., *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225 [118 Cal.Rptr. 158, 529 P.2d 582].)

With the passage of Proposition 13 in 1978 the burden of school financing became even heavier. "Proposition 13 prohibits ad valorem property taxes in excess of 1%, except to finance previously authorized indebtedness. Since most localities have reached this 1% limit, school districts cannot raise property taxes even if two-thirds of a district's voters wanted to finance school construction." (Financing School Facilities, *supra,* at p. 4; see Ed. Code, § 17786 ["the Legislature recognizes that the ad valorem tax is no longer available as a source of revenue for the construction of necessary school facilities"].) Moreover, although Proposition 13 authorizes the imposition of "special taxes" by a vote of two-thirds of the electorate, such special taxes have rarely been imposed, remain novel, and as consequence are evidently not perceived as a practical method of school facility financing—especially in view of the need for a two-thirds vote of the electorate to approve them. (Financing School Facilities, *supra,* at pp. 4, 14.)

In the face of such difficulties besetting local governments, the state has not taken over any substantial part of the responsibility of financing school facilities, less still full responsibility. To be sure, in order to implement the *Serrano* decision the Legislature has significantly increased assistance to education. But it has channeled by far the greater part of such assistance into educational programs and the lesser part into school facilities; in fiscal year 1981-1982, for example, only 3.6 percent went for such facilities. (Financing School Facilities, *supra,* at pp. 3, 4, 6.) The Legislature has developed "no long-term, comprehensive solution to the acute and chronic facilities financing needs of local school districts," but rather has enacted merely "a series of stop-gap, patchwork measures." (*Id.* at p. 6.) Moreover, because of, among other things, the state budget crisis in the early 1980's and other factors the Legislature has not adequately funded such measures as it has enacted—indeed, "[i]n the past several years, state-supported construction finance has waned . . . ." (*Id.* at pp. 6, 16.) Thus, although the burden of financing school facilities appears too heavy for some localities to bear, they continue to bear it in large part alone.

II

In 1974 the Board of Supervisors of San Diego County adopted in the form relevant here a land-use policy, designated Policy I-43 (sometimes hereafter the Policy), to help assure orderly growth in the face of widespread and rapid development and a consequent general increase in population. In the Policy, the board of supervisors described the basic problem:

"In many cases, . . . the required public services have not . . . been installed by the time the development shows a need. The result has been that residents in the newly developed areas have been inadequately served with schools." It then went on to frame a solution: "Before giving approval to development proposals involving a special use permit or a rezoning, . . . the proponent of the development proposal . . . [must] make certain provisions, in conjunction with appropriate governmental agencies, to insure: [¶] That the proponent of the development present evidence satisfactory to the Planning Commission, at the time of its consideration of the matter, and to the Board of Supervisors at the time of its consideration of the matter that public school services will in fact be provided concurrent with the need." As evidence that such services and facilities would be provided, the county accepted so-called "school-availability" letters from the local school districts.

In 1977 respondents Grossmont Union High School District (the District) and its governing board (the Board) recognized that developments being proposed at that time might cause overcrowding, and sent letters to that effect to the county. On the basis of such letters, the planning commission concluded that the District could not in fact provide adequate school facilities concurrent with the need created by the proposed developments, and accordingly permitted few if any such developments to proceed.

In the fall of 1977 the predecessor of petitioner Candid Enterprises, Inc. expressed its willingness to enter into an agreement with the District to permit its development to proceed: it would agree to pay fees for school facilities and the District would issue a school-availability letter to the county indicating that such facilities would be provided.[2] The District approved the agreement in principle and, in order to facilitate it and others like it, adopted Revised Policy FF, which allowed for assessment, under Policy I-43, of school-impact fees from developers, to be used for temporary or permanent facilities. In the spring of 1978 the District entered into an agreement with petitioner's predecessor secured by the real property under development. By its terms the developer agreed to pay the established fees at the time it sought building permits, and the District issued a school-availability letter advising the county of the agreement and of its ability to provide adequate school facilities through use of the fees.

Meanwhile, the School Facilities Act had become effective on January 1, 1978. Under the Act, cities and counties were authorized to enact ordinances to require developers to pay fees for temporary school facilities.

---

[2] The president of petitioner and its predecessor is one and the same person.

(§ 65974.) In the spring of 1978 the board of supervisors enacted such an ordinance, designated Ordinance 5120. Shortly thereafter, in order to facilitate agreements with developers for the payment of fees for temporary facilities under the Act, the District adopted a resolution finding that conditions of overcrowding existed and that it lacked financial resources to provide additional needed school facilities.

In 1978 and 1979 the District assessed some developers for fees for temporary facilities pursuant to the School Facilities Act and Ordinance 5120; with others it entered into secured agreements for the payment of fees for temporary or permanent facilities, in lieu of School Facilities Act fees, pursuant to Policy I-43 and Revised Policy FF. Because of a districtwide decline in enrollment, in February 1980 the District discontinued collecting School Facilities Act fees. At the same time it also discontinued entering into Policy I-43 secured agreements, although it stated its intent to continue to monitor proposed developments, enter into such agreements when necessary, and collect fees under existing agreements in order to provide adequate facilities concurrent with the need that the subject developments were expected to create.

Petitioner, which had purchased a three-lot condominium project from its predecessor, sought building permits late in 1980. In early 1981 it paid under protest $23,500 in Policy I-43 school-impact fees pursuant to the secured agreement between the District and its predecessor. Petitioner then unsuccessfully sought a refund by a letter to the District. Next it requested to speak to the Board on the matter, and was granted permission. At the meeting petitioner asked that in view of declining districtwide enrollment, the Board refund the fees paid under protest and cancel its secured agreement and all other similar agreements. The Board found that the District (1) discontinued collecting School Facilities Act fees and entering into Policy I-43 secured agreements "since it was projected that funds committed under existing agreements would be sufficient to mitigate future impact[,]" (2) "reserved the right to require the commitment of fees from future developments which promised to upset this condition of balance[,]" and (3) never had "any intention to disregard existing agreements, since the housing from projects covered by those agreements will adversely impact the District at their time of completion." The Board then denied petitioner's request.

Petitioner initiated this proceeding for a writ of mandate pursuant to Code of Civil Procedure sections 1094.5 (administrative mandate) and 1084 (ordinary mandate). Respondents filed a demurrer and an answer. After a hearing the trial court overruled the demurrer and ordered that mandate issue.

From the ensuing judgment respondents appeal, arguing the substantive point that the imposition of Policy I-43 school-impact fees was not invalid on either preemption or equal protection grounds. ▆ ▆▆ ▆ As we explain below, we find their position meritorious.[3]

## III

▆ Respondents first contend that the imposition of Policy I-43 school-impact fees is not preempted by the School Facilities Act and is accordingly valid. Petitioner concedes as it must that the imposition of school-impact fees is generally valid. (See *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court, supra,* 13 Cal.3d 225, 232, fn. 6.) Respondents proceed to argue successfully that the local legislation is not preempted by the Act on the ground that there is no conflict.

▆ Under the police power granted by the Constitution, counties and cities have plenary authority to govern, subject only to the limitation that they exercise this power within their territorial limits and subordinate to state law. (Cal. Const., art. XI, § 7.) Apart from this limitation, the "police power [of a county or city] under this provision . . . is as broad as the police power exercisable by the Legislature itself." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 140 [130 Cal.Rptr. 465, 550 P.2d 1001].)

▆ If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void. (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484 [204 Cal.Rptr. 897, 683 P.2d 1150]; *Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 807 [100 Cal.Rptr. 609, 494 P.2d 681].) A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " (Citations omitted.) (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 484.)

---

[3]Respondents also press the procedural point that their demurrer should have been sustained. This argument, however, is untenable. Although the writ of administrative mandate does not lie because the Board was not required by law to grant petitioner a hearing on its request (Code Civ. Proc., § 1094.5, subd. (a); *Court House Plaza Co.* v. *City of Palo Alto* (1981) 117 Cal.App.3d 871, 880 [173 Cal.Rptr. 161]), the writ of ordinary mandate is available. Mandate requires that there be no "plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.) There was no such remedy here: an action on the contract for refund of fees paid and release from payment of the remainder was inadequate because there were no grounds on which to allege a breach or to seek rescission; no statutory action for a refund then existed, although one now does (§ 65913.5, subd. (e)); and an action for declaratory relief was inappropriate insofar as petitioner was attacking the local legislation as applied (*Mobil Oil Corp.* v. *Superior Court* (1976) 59 Cal.App.3d 293, 307 [130 Cal.Rptr. 814]). The writ of mandate may of course be used, as it is used here, to challenge the validity of a legislative measure. (E.g., *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, fn. 2 [96 Cal.Rptr. 697, 488 P.2d 1].)

■ Respondents argue and petitioner concedes that Policy I-43 school-impact fees do not contradict or duplicate the provisions of the School Facilities Act. Respondents further assert that such fees have not entered an area fully occupied by state law. They are persuasive.

First, the area of financing of school facilities needed by new development has not been expressly occupied by state law. The Legislature has not voiced such an intent in any of its enactments, and petitioner admits as much.

Second, the area has not been impliedly occupied by state law. ■ "In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.'" (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d 476, 485, quoting from *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809]; accord, *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 708 [209 Cal.Rptr. 682, 693 P.2d 261] and cases cited.)

■ Petitioner concedes, as it must, that the imposition of Policy I-43 school-impact fees does not satisfy the third test, and respondents successfully urge that it satisfies neither of the other two.[4]

First, the subject matter of the local measure—the financing of the construction of both temporary and permanent school facilities to meet the demands imposed by new development—has not been so fully and complete-

---

[4]How the relevant field occupied by the allegedly preemptive state legislation is defined is often crucial to the result: "If the definition is narrow, preemption is circumscribed; if it is broad, the sweep of preemption is expanded." (*California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 27-28 [61 Cal.Rptr. 618]; see *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 84 [191 Cal.Rptr. 47].) The issue of definition, however, is not crucial here. Whether the School Facilities Act is held to occupy the narrow field of the financing of temporary facilities (as it evidently should be) or the broad field of the financing of all facilities (as it evidently should not be) is of no consequence in the case before us. As we shall explain, the Act recognizes and in fact permits local action, and thereby fails to occupy either field to the exclusion of local legislation.

ly covered by general law as to clearly indicate that it has become exclusively a matter of state concern.

Taken by itself, the School Facilities Act does not even purport to deal with the construction of permanent facilities (see §§ 65970, subd. (e), 65974), and does not fully and completely cover the construction of temporary facilities. The Act recognizes alternative, local financing arrangements: "One year after receipt of any apportionment pursuant to the Leroy F. Greene State School Building Lease-Purchase Law of 1976 . . . for the construction of a school, the city or county shall not be permitted thereafter, pursuant to this chapter *or pursuant to any other school facilities financing arrangement such district may have with builders of residential development,* to levy any fee or to require the dedication of any land within the attendance area of the district." (§ 65979, italics added.) The Act, moreover, clearly permits such arrangements. The school district is required to notify the local legislative body if it finds that "(a) conditions of overcrowding exist in one or more attendance areas within the district which will impair the normal functioning of educational programs including the reason for such conditions existing; and (b) that all reasonable methods of mitigating conditions of overcrowding have been evaluated and no feasible method for reducing such conditions exist [*sic*] . . . ." (§ 65971.) The Act goes on to define "reasonable methods for mitigating conditions of overcrowding": they "shall include, *but are not limited to,* agreements between a subdivider and the affected school district whereby temporary-use buildings will be leased to the school district or temporary-use buildings owned by the school district will be used." (§ 65973, subd. (b), italics added.)

Even if we consider the School Facilities Act together with other related state legislation, we come to the same conclusion: the subject matter of this local measure has not been fully and completely covered by state law. Although, as petitioner correctly argues, there are several state and local programs that provide funding for the construction of school facilities,[5] the general situation may properly be described in the words already quoted of one of petitioner's principal authorities: "Since the passage of Proposition 13, financing for school construction and facility maintenance has been a series of stop-gap, patchwork measures. There still exists no long-term, comprehensive solution to the acute and chronic facilities financing needs of local school districts." (Financing School Facilities, *supra,* at p. 6.)

---

[5]These include, for example, the School Facilities Act, the Leroy F. Greene State School Building Lease-Purchase Law of 1976 (hereinafter the Greene Act) (Ed. Code, § 17700 et seq.), the Mello-Roos Community Facilities Act of 1982 (§ 53311 et seq.), and the New Schools Relief Act of 1979 (Ed. Code, § 39050 et seq.).

The evident absence of implied preemptive intent in the terms of the School Facilities Act—whether we consider it by itself or with other related legislation—is confirmed by the failure of the Legislature to fully cover the financing of school facilities. First, not all school districts in need of funds for permanent facilities can qualify to receive them under the Greene Act. (See Ed. Code, § 17740.) Second, for a variety of reasons the Legislature has failed to provide adequate funding for even such "stop-gap, patchwork" programs as currently exist. In such circumstances, to construe alternative, local arrangements such as that before us to be preempted would severely impede local governments and school districts in carrying out their responsibilities. It would also frustrate the intent of the Legislature in enacting the School Facilities Act: "Adequate school facilities should be available for children residing in new residential developments." (§ 65970, subd. (a).) Thus, under this test—i.e., whether the subject matter of the local measure has been so fully covered by state law as to clearly indicate that it has become exclusively a matter of state concern—the Act is shown not to be preemptive.[6]

Second, the subject matter of this local measure has not been partially covered by state law couched in such terms as to indicate clearly that a paramount state concern will not tolerate additional local action. The evidence on which we base our conclusion is compelling: the School Facilities Act, as we have explained, unmistakably recognizes and permits local action. Thus, under this test too the Act is shown not to be preemptive.

■ To summarize: "Preemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations. Similarly, it should not be found when the statutory scheme recognizes local regulations." (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d 476, 485.) ■ Accordingly, we conclude that the School Facilities Act, because it both permits and recognizes local measures such as this, does not have implied preemptive effect.

To avoid this conclusion, petitioner relies heavily on an opinion by the Attorney General. (62 Ops.Cal.Atty.Gen. 601 (1979).) Among the questions addressed in the opinion is whether the School Facilities Act preempts the imposition of school-impact fees by local government to provide permanent facilities. (*Id.* at p. 601.) To this the Attorney General answered

---

[6]We do not mean to imply that the Legislature may not occupy a field unless it appropriates the funds necessary to carry out its intent. We also note that in some cases the "inadequacy" of state funding may prove to be too speculative or subjective a criterion on which to base a conclusion that the Legislature has not intended to preempt local action.

yes. (*Id.* at pp. 605-609.) The conclusion is erroneous, however, because the analysis is faulty.

First, the opinion reasons that the Act restricts the fees that may be imposed to no more than " 'the amount necessary to pay five annual lease payments for the interim facilities,' " and that such a restriction "would be meaningless if a city council or board of supervisors could exact additional developer fees for permanent school facilities." (*Id.* at p. 607, quoting § 65974, subd. (d).) This position might be sound if the Act were intended to limit the authority of local government to make such exactions, but it is not. The purpose of the Act is to encourage local school districts to identify, and local governments to deal with, the effects of residential development on school facilities and to provide local government with "new and improved methods" to cope with the effects of such development "within a reasonable period of time" and on a short-term basis. (See §§ 65970-65971.) Accordingly, the restriction on the amount of fees that may be imposed is properly to be construed as an attempt on the part of the Legislature to ensure that local governments not indefinitely avoid the problem of the construction of permanent facilities by agreeing to the long-term use of temporary facilities.

Second, the opinion reasons that the 1979 addition of section 65980, which expressly limits the scope of the Act to temporary facilities, when as initially enacted it "was arguably broad enough to cover permanent facilities [as well,] . . . indicated an intent to restrict the amount and purpose of the fees to be collected from developers." (62 Ops.Cal.Atty.Gen., *supra,* at p. 607.) This position is undermined, however, by the conclusions we reach above: the Legislature evidently intended that local governments use fees authorized by the Act as a short-term solution—*not* that local governments be prohibited from developing and implementing long-term solutions. It is also undermined by the language of section 65979, which was added to the Act at the same time as section 65980: "One year after receipt of an apportionment pursuant to the [Greene Act] . . . for the construction of a school, the city or county shall not be permitted thereafter, pursuant to this chapter *or pursuant to any other school facilities financing arrangement such district may have with builders of residential development,* to levy any fee or to require the dedication of any land within the attendance area of the district." (Italics added.) Thus, section 65979 expressly recognizes "other school facilities financing arrangement[s]" between local government and developers, and prohibits exactions pursuant to such arrangements *only* when the locality has received an apportionment for permanent facilities pursuant to the Greene Act. Had the Legislature intended the School

Facilities Act to preempt such "school facilities financing arrangement[s]," the reference to them would have been meaningless.

Third, the opinion reasons by analogy to the Subdivision Map Act that "the express grant of authority to impose school impact fees and dedications upon developers under [the Act], with strict limitations as to amount, evidences an intent by the Legislature to preempt the field to the exclusion of local regulation." (62 Ops.Cal.Atty.Gen., *supra*, at p. 608.) But even if the opinion is correct in concluding that the intent of the Legislature in the Subdivision Map Act is to prohibit local government from making exactions that the Act does not expressly authorize, it errs in reading such an intent into the School Facilities Act. Here the Legislature recognizes (§ 65979) and in fact permits (§§ 65971, 65973, subd. (b)) local legislation, and has accordingly indicated its clear intent that the "new and improved methods of financing for interim school facilities" that the Act provides are merely supplementary to, and not preemptive of, local action (§ 65970, subd. (e)).

IV

■ Respondents' other contention is that the imposition of Policy I-43 school-impact fees does not violate the equal protection clause and is accordingly valid. This claim too is successful.

The imposition of school-impact fees is an undisputed and indisputable instance of economic regulation. As such, we must review it under "the basic and conventional standard," which "invests legislation . . . with a presumption of constitutionality and 'requir[es] merely that distinctions drawn by a challenged [measure] bear some rational relationship to a conceivable legitimate state purpose.'" (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16 [112 Cal.Rptr. 786, 520 P.2d 10]; see *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court, supra,* 13 Cal.3d 225, 232-233.) As petitioner implicitly concedes, we may not review the challenged local measure under any stricter standard: developers do not constitute a "suspect class," and development is not a "fundamental interest" (see *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 328 [170 Cal.Rptr. 685]). Under the conventional standard, "the burden of demonstrating the invalidity of a classification . . . rests squarely upon *the party who assails it.*" (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at p. 17, italics in original.) Petitioner has failed to carry this burden.

If, as respondents argue and we are inclined to hold, the class of similarly situated persons comprises all developers who have entered into a secured

agreement to obtain a school-availability letter, then no discrimination at all appears: the Board has collected fees as they have become due and has stated its intent to continue to collect them. But even if, as petitioner responds, the class comprises all developers who are currently building in the district, still no unlawful discrimination emerges. The Board entered into secured agreements covering certain developments proposed in 1978 and 1979 because it expected them to cause or aggravate overcrowding in neighboring schools. The Board has not entered into such agreements covering developments proposed subsequently because it has not expected them to have such an adverse effect. Thus if developers currently building in the district are treated differently, such difference is reasonable and therefore lawful: developers who are expected to cause or aggravate overcrowding are required to mitigate it, others are not.

The judgment is reversed.[7]

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

---

[7]Because of our disposition we do not reach the question whether petitioner waived its right to the fees it paid under protest by accepting the benefits of the agreement with the District.