[No. A078481. First Dist., Div. Three. Dec. 10, 1997.]

FIRST PRESBYTERIAN CHURCH OF BERKELEY, Plaintiff and Respondent, v.
CITY OF BERKELEY et al., Defendants and Appellants.

## COUNSEL

Manuela Albuquerque, City Attorney, and Zach Cowan, Assistant City Attorney, for Defendants and Appellants.

Thomas E. Ho'okano for Plaintiff and Respondent.

## OPINION

**WALKER, J.**—In this case we are asked to determine the extent to which the Ellis Act (Gov. Code, § 7060 et seq.)[1] preempts the power of a municipality to regulate and control a landowner's efforts to demolish or alter the use of property formerly used for residential rental purposes. The City of Berkeley (City), City Council of Berkeley (City Council), Berkeley Landmarks Preservation Commission (Landmarks Commission) and Berkeley Zoning Adjustment Board (Zoning Board) (collectively referred to as appellants) appeal from a judgment granting declaratory and injunctive relief and a peremptory writ of mandate in favor of respondent First Presbyterian Church of Berkeley (the Church), ordering appellants (1) to set aside and vacate their decisions (a) denying the Church's application for a demolition permit under the City's neighborhood preservation ordinance (Berkeley Ord. No. 4641-N.S.) (NPO), and (b) requiring the Church to prepare an environmental impact report (EIR) as a prerequisite to issuing a demolition permit under the City's NPO, landmarks preservation ordinance (Berkeley Ord. No. 4694-N.S., codified as Berkeley Municipal Code [BMC] ch. 3.24) (LPO) and the California Environmental Quality Act (CEQA) (Pub. Resources Code, §§ 21000 et seq., 21080, subd. (c)); and (2) to process the Church's pending application for a demolition permit as a ministerial action. In so ordering, the trial court found the Ellis Act guarantees landlords the right to the ministerial issuance of permits to demolish structures removed from the residential rental market; and both the NPO and the LPO are preempted by the Ellis Act insofar as they interfere with or restrain the ability of landlords to demolish residential rental property.

We conclude the NPO is in conflict with the guarantees of the Ellis Act, and thus the trial court was correct in determining the NPO has been preempted by the Ellis Act insofar as it interferes with or restrains the ability of landlords to remove residential rental property from the market or demolish such property in order to preserve the supply of rental housing. We therefore affirm the portions of the trial court's judgment and order barring the application of the NPO to any decisions whether to grant or deny a

---

[1]Unless otherwise indicated, all further statutory references are to the Government Code.

permit to demolish residential real property, including the Church's property at issue, for the purpose of preserving the supply of rental housing. However, we conclude the preemptive scope of the Ellis Act over local and municipal regulations does not extend to environmental and other land use regulations, procedures and controls which govern the demolition and redevelopment of residential property without limiting the right of landlords to withdraw from the residential real estate business. Because the judgment and order of the trial court erred in so extending the scope of the Ellis Act and its preemptive effect to local discretionary controls over the demolition of property, including the LPO in this case, we must reverse in part.

### FACTUAL AND PROCEDURAL BACKGROUND

Respondent Church is the owner of a parcel of real property located at 2419 Haste Street in Berkeley (the Property), presently occupied by a three-story building constructed in 1906 (the Building). The Building was originally an annex to the McKinley School and contained school classrooms. After being used first as a public school building, it became an art center and a dance studio. Later, it was a private school for approximately 20 years. It was then modified for and used as residential housing with 12 apartment units. In 1983, the Church purchased the Building with the intention of using the Property to build facilities to house its administrative offices and for other functions. In January 1987, the Landmarks Commission designated the Building a "structure of merit" under the LPO. (BMC, §§ 3.24.110 to 3.24.160.)

In October 1995, the Church applied for a permit to demolish the Building in order to make room on the Property for expansion of its facilities. Because the Building had been used as residential rental property, the City submitted its application to the Zoning Board under the NPO. The City declared the Church's application complete on October 12, 1995, triggering the statutory deadline for acting on the application under the timelines established by the Permit Streamlining Act (§ 65920 et seq.) (PSA). Under the PSA, a negative declaration must be completed for any proposed project which will *not* have a significant adverse impact on the environment within 105 days after the project application is complete. The government agency is then required to take action on the application within 90 days of adoption of the negative declaration, or else it will be deemed approved by operation of law. (§§ 65941, 65943, 65956, subd. (b).) In this case, the effect of the PSA was to require the City to take action on the Church's application within 195 days of its completion, or by April 22, 1996.

On October 23, 1995, the City's environmental review officer determined that even though the Building was at that time designated a structure of

merit, the change in its significance as a historic resource could be mitigated to a level of insignificance. The environmental review officer therefore made a preliminary determination it would not be necessary to prepare an EIR for the demolition application, and an initial study and negative declaration would suffice under applicable city codes and ordinances and the CEQA (Pub. Resources Code, §§ 21000 et seq., 21080, subd. (c).)[2] The Zoning Board set the application for hearing on November 13, 1995. Nevertheless, because the Building had been designated a "structure of merit," the Zoning Board also referred the demolition application to the Landmarks Commission on November 6, 1995, pursuant to the LPO, BMC section 3.24.210.

Following a public hearing on November 6, 1995, the Landmarks Commission voted to suspend consideration of the demolition application for 180 days. This suspension resulted in postponement of the hearing before the Zoning Board. On November 20, 1995, the Church appealed the Landmarks Commission's decision to the City Council. Under the LPO, the Church's appeal of the suspension stayed all proceedings by any party in connection with the matter upon which the appeal was taken, until determination of the appeal. (BMC, § 3.24.300.B.) Nevertheless, on December 4, 1995, while the Church's appeal was still pending, the Landmarks Commission initiated proceedings to designate the Building a "landmark." On January 23, 1996, the City Council reversed the decision of the Landmarks Commission suspending processing of the demolition application. By resolution No. 58,329-N.S., the City Council stated that the City had granted the Church's demolition application.

On February 5, 1996, following a public hearing, the Landmarks Commission designated the Building a "landmark" pursuant to BMC chapter 3.24. On February 13, 1996, at least in part as a result of this change in the designation of the Building from "structure of merit" to "landmark," the office of the environmental review officer reversed its initial determination that a negative declaration under CEQA would be sufficient for the demolition application, and made a new determination that an EIR would be

---

[2]CEQA requires a full EIR of projects which might have a significant impact on the environment, but only a brief "initial study" and "negative declaration" for projects which will not have a significant impact. (Pub. Resources Code, §§ 21002.1, subd. (b), 21080, subd. (a), 21081; Cal. Code Regs., tit. 14, §§ 15091, 15124-15125, 15126, subds. (a)-(f), 15130; see *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].)

In particular, CEQA states that "[h]istorical resources included in a local register of historical resources . . . are presumed to be historically or culturally significant . . . unless the preponderance of the evidence demonstrates that the resource is not historically or culturally significant," and requires the preparation of an EIR for any project "that may cause a substantial adverse change in the significance of an historical resource . . . ." (Pub. Resources Code, § 21084.1; see *League for Protection of Oakland's etc. Historic Resources* v. *City of Oakland* (1997) 52 Cal.App.4th 896, 903-910 [60 Cal.Rptr.2d 821].)

necessary. Following public hearings between March 11 and 25, 1996, the Zoning Board affirmed the determination that an EIR would be required for the demolition application under Public Resources Code section 21084.1. The Church appealed to the City Council both the decision of the Landmarks Commission designating the Building a landmark and that of the Zoning Board requiring an EIR for the demolition application.

On April 16, 1996, the City Council held a public hearing on the Church's appeals. At the hearing, the City attorney stated that the City Council's previously adopted resolution No. 58,329-N.S. granting the Church a demolition permit was in error, and the City did not intend for the Church to rely on that resolution. Following the hearing, the City Council affirmed both the designation of the Building as a landmark, and the decision to require an EIR. The decision to require an EIR extended the time for processing the Church's demolition permit application under the PSA from April 22, 1996, to April 7, 1997.

In anticipation of its demolition project, the Church removed the subject Property and Building from the residential rental market by giving notice to the tenants pursuant to the Ellis Act. However, the Church did not initiate the preparation of an EIR. On June 10, 1996, the Church notified the City of its intention to invoke its rights under the PSA, pursuant to which its demolition application would be deemed approved as a matter of law 60 days from the date of public notice to that effect. On June 18, 1996, the Church filed its petition for writ of mandate and complaint for damages, declaratory and injunctive relief in this action. On July 22, 1996, the Zoning Board formally denied the Church's application for a demolition permit, on the grounds the Church had failed to prepare an EIR. On July 31, 1996, the Church appealed this decision to the City Council and published its public notice under the PSA. On September 17, 1996, the City Council affirmed the decision of the Zoning Board denying the application for a demolition permit.

The Church's first amended petition for writ of mandate and complaint alleged 13 causes of action. On February 14, 1997, pursuant to stipulation, the trial court issued a case management order bifurcating the issues connected with the writ of mandate from the remaining issues. On April 30, 1997, the trial court heard argument on the Church's claims of preemption under the Ellis Act, the PSA, CEQA, section 37361, and the LPO. At the conclusion of the hearing, the trial court stated its agreement with the Church's arguments. It granted the Church judgment on the pleadings on its 1st, 2d, and 8th causes of action in full, and on its 10th, 12th and 13th causes of action insofar as they related to the issues agreed to be tried in the

bifurcated proceeding. The trial court ruled that the Ellis Act entirely preempted all the City's demolition procedures under the NPO, the LPO and CEQA, and "guaranteed" the granting of an application for a demolition permit as a purely ministerial action. On May 13, 1997, the trial court issued a judgment ordering the City (1) "to set aside and vacate" its decisions (a) requiring preparation of an EIR as a prerequisite to issuing the Church a demolition permit under the NPO, and (b) denying the application for a demolition permit under the NPO; and (2) directing the City to process the Church's application for a demolition permit as a purely ministerial action under the City's building code.

In the statement of decision accompanying its judgment, the trial court stated:

"The City's application of its NPO to [the Church's] application for a demolition permit is invalid in that it conflicts with the guarantees provided to landlords under the Ellis Act. The Act provides landlords with the right to go out of the rental business and to demolish those structures removed from the rental market. The Berkeley NPO would qualify that right by the exercise of the City's discretion and therefore the NPO is hereby declared invalid and of no force and effect to the extent that issuance of a demolition permit would require findings as to future construction of units or habitability of the structure to be demolished. [Citing *Los Angeles Lincoln Place Investors, Ltd.* v. *City of Los Angeles* (1997) 54 Cal.App.4th 53 [62 Cal.Rptr.2d 600].]

"Likewise, the City's request that the Church prepare an environmental impact report based upon its application of the NPO to the application for demolition permit is invalid in that the issuance of the demolition permit is guaranteed by the Ellis Act as a ministerial action and CEQA only applies to municipal actions involving the exercise of discretion.

". . . . . . . . . . . . . . . . . . . . . . . .

"The Court finds in light of the guarantees to landlords set out in the Ellis Act that the [B]uilding's status as a 'building of merit' does not convey special status on it such that the City may exercise its discretion to deny issuance of a demolition permit. Issuance of the demolition permit as regards the . . . Building is a purely ministerial action.

". . . . . . . . . . . . . . . . . . . . . . . .

"The Court declares that the Berkeley [NPO] and [LPO] have been preempted by the State Ellis Act in so far as they interfere with and restrain the ability of landlords seeking to remove and demolish rental units from the rental market."

The trial court granted a permanent injunction restraining the City from applying the NPO to the Building "or to any other applications before the City seeking to demolish rental units removed from the rental market." In addition, the trial court found that the City's attempt to designate the Building a landmark violated the administrative procedures set out in the City's own ordinances,[3] as well as section 37361.[4] With the parties' agreement, the trial court dismissed all of the Church's remaining claims which had not been presented in the petition for writ of mandate. This appeal timely followed.

## DISCUSSION

The sole issue raised by appellants on appeal is the extent to which the Ellis Act preempts the City's demolition procedures and controls. Thus,

---

[3]"The Court further finds that the City's attempt to landmark the subject [Building] violated the procedures set out in City ordinances. Specifically, a stay as to all actions regarding the subject property, as admitted by the City Manager, was in effect due to the Church's filing of its notice of appeal regarding the decision to suspend the processing of its application for a demolition permit. Said appeal was filed by the Church on November 20, 1995. The City's Landmark Preservation Commission began the landmarking process under the City's ordinance on December 4, 1995 while the stay was in effect in violation of City Ordinance Section 3.24.300.B. The . . . Building therefore does not have landmark status because the City did not carefully follow its own procedures as required by law and the landmarking attempt is thereby rendered null and void."

[4]As applicable to this case, section 37361 provides in pertinent part: "(b) The legislative body may provide for places, buildings, structures, works of art, and other objects, having a special character or special historical or aesthetic interest or value, special conditions or regulations for their protection, enhancement, perpetuation or use, which may include appropriate and reasonable control of the use or appearance of neighboring private property within public view, or both.

"(c) Until January 1, 1995, subdivision (b) shall not apply to noncommercial property owned by a religiously affiliated association or corporation not organized for private profit, whether incorporated as a religious or public benefit corporation, unless the owner of the property does not object to its application. This subdivision does apply to a charter city. Nothing in this subdivision shall be construed to infringe on the authority of the legislative body to enforce special conditions and regulations on any property designated prior to January 1, 1994. Subdivision (b) shall not apply to noncommercial property owned by any association or corporation that is religiously affiliated and not organized for private profit, whether the corporation is organized as a religious corporation, or as a public benefit corporation, provided that both of the following occur:

"(1) The association or corporation objects to the application of the subdivision to its property.

"(2) The association or corporation determines in a public forum that it will suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission, if the application is approved.

"(e) Nothing in this subdivision shall be construed to infringe on the authority of any legislative body to enforce special conditions and regulations on any property designated prior to January 1, 1994 . . . ."

the causes of action of the Church's complaint with which we are concerned on this appeal are the 2d cause of action alleging a violation of the Ellis Act; the 10th cause of action, insofar as it alleges that the Ellis Act preempts the application of CEQA to the Church's application for a demolition permit; and the 12th and 13th causes of action for declaratory and injunctive relief. Appellants do not contest the trial court's rulings on the remaining causes of action.[5]

We conclude the trial court correctly ruled: (1) the Ellis Act "provides landlords with the right to go out of the rental business"; (2) the Ellis Act preempts the NPO and the LPO "in so far as they interfere with and restrain the ability of landlords seeking to remove . . . rental units from the rental market"; and (3) the NPO is therefore "invalid and of no force and effect to the extent that issuance of a demolition permit [under the NPO] would require findings as to future construction of units or habitability of the structure to be demolished."

However, the trial court was incorrect insofar as it ruled the Ellis Act guarantees landlords a "right . . . to demolish those structures removed from the rental market" as a "ministerial action." Contrary to the trial court's ruling, the Ellis Act does not preempt the continuing regulatory power of public entities to submit applications for demolition permits to discretionary review pursuant to their police power with respect to land use, where this regulatory review is based on criteria having nothing to do with the maintenance of residential units in the rental market. Thus, the trial court erred in ruling that the City may not require the preparation of an EIR pursuant to CEQA, or exercise its discretion to deny issuance of a demolition permit under the LPO and NPO based on the historic or aesthetic value of the building to be demolished. As long as the demolition permit process is not conditioned on or tied to a permit to withdraw residential units from the rental market, the City retains such discretion to deny a demolition permit under its police power with respect to land use.

*The Ellis Act*

The Legislature enacted the Ellis Act to supersede the decision in *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97 [207 Cal.Rptr. 285, 688 P.2d 894], in which the California Supreme Court upheld the constitutionality of a provision of the Santa Monica City Charter prohibiting the removal of rental

---

[5]These concern the alleged violation of section 37361 (first cause of action); and the City's violation of its own administrative procedures in its processing of the Church's demolition permit application under the NPO and the LPO and its designation of the Building as a landmark (eighth cause of action).

units from the housing market by conversion, demolition or other means without a removal permit from the Santa Monica Rent Control Board. Section 7060, subdivision (a) states: "No public entity, as defined in Section 811.2, shall, by statute, ordinance, or regulation, or by administrative action implementing any statute, ordinance or regulation, compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease."[6]

The Ellis Act contains explicit limitations on its scope, leaving areas beyond its reach in which local public entities may continue to regulate land use in a manner otherwise consistent with the terms of the act. Thus, the act states: "Notwithstanding Section 7060, nothing in this chapter does any of the following: [¶] . . . [¶] (b) Diminishes or enhances . . . any power which currently exists or which may hereafter exist in any public entity to grant or deny any entitlement to the use of real property, including, but not limited to, planning, zoning, and subdivision map approvals." (§ 7060.1, subd. (b).) Elsewhere the act also provides: "[T]his act is not otherwise intended to do any of the following: [¶] (1) Interfere with local governmental authority over land use, including regulation of the conversion of existing housing to condominiums or other subdivided interests." (§ 7060.7, subd. (1).) Nowhere in the Ellis Act is there any provision granting landlords the right to demolish buildings regardless of local land use controls. (*Valnes* v. *Santa Monica Rent Control Bd.* (1990) 221 Cal.App.3d 1116, 1122 [270 Cal.Rptr. 636] [Ellis Act does not automatically enable a landowner to demolish units or convert them into condominiums].)

The first and leading case interpreting the Ellis Act is *City of Santa Monica* v. *Yarmark* (1988) 203 Cal.App.3d 153 [249 Cal.Rptr. 732] (*Yarmark*). At issue in *Yarmark* were a portion of the Santa Monica Charter and accompanying eviction and demolition ordinances purporting to condition a landlord's right to remove units from the housing market on the obtaining of proper permits. The permits in question barred landlords who were capable of making a fair return by retaining and renting out controlled rental units from removing such units from the rental housing market by demolition, conversion, eviction or other means *unless* the units were uninhabitable and incapable of being made habitable in an economically feasible manner, or unless the landlords promised to develop new multifamily rental

---

[6]Section 7060.7 specifically states the legislative intent as follows: "It is the intent of the Legislature in enacting this chapter to supersede any holding or portion of any holding in Nash v. City of Santa Monica, 37 Cal.3d 97 to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business. However, this act is not otherwise intended to do any of the following:

"(1) Interfere with local governmental authority over land use, including regulation of the conversion of existing housing to condominiums or other subdivided interests."

units, at least 15 percent of which would be affordable to persons with low income. (*Yarmark, supra,* 203 Cal.App.3d at pp. 162-164.)

The Court of Appeal held these provisions were preempted because they were in direct conflict with the Ellis Act's purpose "to allow landlords who comply with its terms to go out of the residential rental business by evicting their tenants and withdrawing all units from the market, even if the landlords could make a fair return, the property is habitable, and the landlords lack approval for future use of the land. . . . [T]he Act was intended to overrule the *Nash* decision so as to permit landlords the unfettered right to remove all residential rental units from the market, consistent, of course, with guidelines as set forth in the Act and adopted by local governments in accordance thereto." (*Yarmark, supra,* 203 Cal.App.3d at p. 165; *id.* at p. 171.) Nevertheless, even while upholding preemptive scope of the Ellis Act with respect to Santa Monica's attempts to restrict the power of landlords to evict tenants and remove rental units from the market, the *Yarmark* court noted that the Ellis Act did not interfere with local land use authority. "The Act contains explicit boundaries, leaving areas for local control in a fashion consistent with its terms. . . . The Act bears no effect on a public entity's power under law to . . . regulate land use through planning, zoning, and subdivision map approvals . . . . (Gov. Code, § 7060.1)." (*Id.* at p. 167, fn. omitted.)

In *Javidzad* v. *City of Santa Monica* (1988) 204 Cal.App.3d 524 [251 Cal.Rptr. 350] (*Javidzad*), the Court of Appeal was faced with the same parties and local regulations dealt with in *Yarmark*. As a result of the decision in *Yarmark*, the landlord had been permitted to evict all his tenants. However, Santa Monica denied the landlord's demolition permit on the ground he had not obtained a removal permit authorizing the permanent removal of the property from the rental housing market. This was the same removal permit process previously found to be in conflict with the Ellis Act and therefore preempted and void. The trial court ordered Santa Monica to process the application for a demolition permit without requiring any removal permit as a condition. "However, because the [Ellis] Act did not otherwise abrogate the City's police power or land use laws, the . . . request for a demolition permit to issue forthwith was held to be excessive, as *valid reasons under City law might exist to deny the permit* or place limitations on it." (*Javidzad, supra,* 204 Cal.App.3d at pp. 528-529, italics added.)

The Court of Appeal upheld the trial court's order. It held the removal permit requirement was inconsistent with the Ellis Act and was not merely a "land use regulation." (204 Cal.App.3d at p. 526.) As the court had previously held in *Yarmark*, the specific removal permit at issue conflicted with the Ellis Act because it impermissibly conditioned the right of landlords to

go out of the rental business upon their compliance with requirements not found in the Ellis Act. As the court noted, the Santa Monica removal permit at issue did not purport to regulate the *subsequent* use of property *following* its removal from the rental market, but instead prescribed standards governing removal of rental units from the market in the first instance. Because it infringed on a landlord's right to go out of the rental housing business, it conflicted directly with the Ellis Act. (*Javidzad, supra,* 204 Cal.App.3d at p. 530.)

Significantly, the Court of Appeal pointed out its holding "merely relieves landlords who seek to exercise their rights under the [Ellis] Act" to quit the rental housing market "from complying with the onerous conditions" of the Santa Monica removal permit process; and that, "[c]ontrary to appellants' protestations, the invalidation of the removal permit process in no way impairs the City's power to regulate the *subsequent* use of the property." (*Javidzad, supra,* 204 Cal.App.3d at p. 531, italics added.) "While appellants repeatedly argue a landlord's right to go out of business pursuant to the Act does not automatically entitle an owner to demolish units or alter the use of the property, the City's continuing regulatory power is not in dispute. The trial court made it clear that notwithstanding the Act, the City otherwise retains its police power with respect to land use, and therefore denied the . . . request for a demolition permit to issue forthwith. . . . [T]he owners, in any redevelopment of the property, are subject to and must comply with all local planning and zoning laws." (*Ibid.*) Thus, "[w]hile the requirement that a removal permit be obtained is superseded by the Act, the City otherwise retains its police power to regulate the particulars of demolition and the redevelopment of property *following* its withdrawal from the rental housing market." (*Ibid.*, italics added.)

### *Ellis Act Preemption of the NPO*

The City's NPO originated as a citizen initiative aimed at regulating residential construction and demolition. As adopted, the NPO originally included several provisions which have since been incorporated into the City's zoning ordinance and are therefore superseded. Only the demolition permit provisions of the NPO found in section 5 have remained operative, except for those parts of section 5 previously conceded by the City to have been preempted by the Ellis Act. (*Groch* v. *City of Berkeley* (1981) 118 Cal.App.3d 518, 520-521 & fn. 3 [173 Cal.Rptr. 534].) The pertinent provisions of NPO section 5 at issue in this case state that an application for demolition of a *residential* building can only be approved if the Zoning Board finds "[1] the demolition would not be materially detrimental to the housing needs and public interest of the affected neighborhood and the City of Berkeley, . . . *and* [2] *either* . . . [a] the demolition will remove a hazardous, unusable or unrepairable structure, *or* . . . [b] the demolition is

necessary to permit construction . . . contain[ing] at least the same number of housing units as the demolished structure . . . ." (Italics added.)

Except for the requirement that demolition not be detrimental to the public interest, these provisions of the NPO are clearly in conflict with the Ellis¹ Act and facially preempted. Just as in the case of the Santa Monica ordinances struck down in *Yarmark* and *Javidzad*, the NPO restricts a landlord's right to demolish a building containing residential units by specifically conditioning any demolition permit on "the housing needs . . . of the affected neighborhood," the removal of a "hazardous, unusable or unrepairable structure," and the construction of "at least the same number of housing units as the demolished structure." The goal of each of these conditions is to keep the affected residential units or their equivalents in the rental housing market if at all possible. By requiring as a condition of granting a permit for demolishing an existing residential structure a showing either that the existing property is unusable or that an equal number of rental housing units will be constructed, these provisions necessarily infringe on a landlord's decision to go out of the rental housing business in precisely the same way as the Santa Monica ordinances at issue in *Yarmark* and *Javidzad*. (*Javidzad, supra,* 204 Cal.App.3d at pp. 525-531; *Yarmark, supra,* 203 Cal.App.3d at pp. 164-171.)

As the trial court correctly ruled, the Ellis Act "provides landlords with the right to go out of the rental business." Thus we conclude the trial court's judgment was correct in ruling that the Ellis Act preempts the NPO insofar as it interferes with and restrains the ability of landlords "seeking to remove . . . rental units from the rental market," and that the NPO is "invalid and of no force and effect to the extent that issuance of a demolition permit [under the NPO] would require findings as to future construction of units or habitability of the structure to be demolished." However, the NPO's requirement that demolition not be detrimental to the public interest of the affected community is not preempted to the extent that it is applied to control demolition based on considerations unrelated to the maintenance or preservation of rental housing.[7]

---

[7]There are public interests unrelated to the maintenance of rental housing stock. As we discuss, *post,* ordinances that promote these interests are not preempted by the Ellis Act. We must uphold ordinances if possible, construing them in a manner preserving their validity. (*Shell Oil Co.* v. *City and County of San Francisco* (1983) 139 Cal.App.3d 917, 921 [189 Cal.Rptr. 276]; *D'Amico* v. *Board of Medical Examiners* (1970) 6 Cal.App.3d 716, 726 [86 Cal.Rptr. 245].) To this end, we will invalidate, strike down or find preempted only those portions of an ordinance that are clearly unconstitutional or preempted by statute, and save those portions that are not, as long as they can accomplish one or all of the legitimate material purposes of the law. (*Parsons Brinckerhoff Quade & Douglas, Inc.* v. *Kern County Employees Retirement Assn.* (1992) 5 Cal.App.4th 1264, 1268 [7 Cal.Rptr.2d 456].) Here, section 10 of the NPO itself provides that "[i]f any provision of this Ordinance or application thereof to any person or circumstance is held invalid, this invalidity shall not affect other provisions of this

*Continuing Viability of the LPO*

Insofar as the trial court ruled the NPO was preempted by the Ellis Act and therefore void "to the extent that issuance of a demolition permit would require findings as to future construction of units or habitability of the structure to be demolished," its judgment is a continuation of the holdings in *Yarmark* and *Javidzad*. The trial court's judgment goes further, however, by ruling that the Ellis Act *guarantees* landlords the right to demolish formerly residential structures subject to no more than purely ministerial permit requirements, without regard to otherwise valid land use regulations aimed at environmental or historical preservation. The practical effect of the trial court's interpretation of the Ellis Act is to grant landlords seeking to demolish buildings a blanket exemption from all environmental and land-mark preservation land use regulations. We are unconvinced the Legislature intended the Ellis Act to be read this broadly.

The case upon which both the Church and the trial court rely for this overbroad interpretation of the Ellis Act is *Los Angeles Lincoln Place Investors, Ltd.* v. *City of Los Angeles* (1997) 54 Cal.App.4th 53 [62 Cal.Rptr.2d 600] (*Lincoln Place*). At issue in *Lincoln Place* was a municipal ordinance providing that a demolition permit would not be granted unless and until one of the following conditions existed: (1) any proposed plans to construct a condominium, stock cooperative or community apartment project were approved by the City of Los Angeles; (2) the owner recorded a sworn affidavit waiving the right to construct such a project for a period of 10 years; (3) the owner planned to develop the site with government-assisted low-income housing; or (4) the building to be demolished was of unrein-forced masonry. When the plaintiffs attempted to obtain a demolition permit to demolish a multi-unit apartment building, the City of Los Angeles refused to process the permit application because the plaintiffs had not obtained approval of any future construction plans. On plaintiffs' petition for writ of mandate, the trial court found the ordinance preempted by the Ellis Act because it improperly restrained the plaintiffs from obtaining a demolition permit by requiring future land use approvals and imposing penalties for lack of such approval. It ordered Los Angeles to issue a demolition permit to the plaintiffs.

The Court of Appeal affirmed. Citing *Yarmark*, the court found: ". . . '[T]he purpose of the [Ellis] Act is to allow landlords who comply with its terms to go out of the residential rental business by evicting their tenants and

Ordinance which can be given effect without the invalid provision or application, and to this end the provisions of this Ordinance are declared to be severable." Thus, to the extent the "public interest" provision in section 5(b)(1) of the NPO is applied to advance public interests of the community that are unrelated to the preservation or maintenance of rental housing, that portion of the NPO is not preempted by the Ellis Act.

withdrawing all units from the market, even if the landlords could make a fair return, the property is habitable, and *the landlords lack approval for future use of the land. . . .*' " (*Lincoln Place, supra,* 54 Cal.App.4th at p. 61, italics added.) The ordinance at issue in *Lincoln Place* expressly *conditioned* the grant of a demolition permit on city approval for future use of the land. Like the Santa Monica ordinance found invalid in *Javidzad,* the Los Angeles ordinance "did not purport to regulate the *subsequent* use of the property *following its withdrawal from the rental market.*" (*Id.* at p. 63, italics added.) Instead, the ordinance conflicted directly with the Ellis Act because it prescribed conditions and standards governing the approval of a demolition permit which impermissibly infringed on a landowner's right simply to go out of the rental business in the first instance, with the practical effect that the landowner would be compelled to remain in the rental business at that location. (*Id.* at pp. 63-65.)

*Lincoln Place* does not support the trial court's judgment in this case with respect to the environmental and historical preservation land use regulations at issue here. Unlike the Los Angeles ordinance at issue in *Lincoln Place,* the LPO does not establish conditions on the granting of a demolition permit that force a landowner to stay in the *rental housing market.* This is because, unlike the facially preempted provisions of the NPO, the purpose of the LPO is *not* to maintain or enhance the residential rental housing needs of the City. Even in instances when the LPO applies to residential housing, its purpose is purely "the prevention of . . . needless destruction and impairment" of "structures, sites and areas of special character or special historical, architectural or aesthetic interests or value," through "[t]he protection, enhancement, perpetuation and use" of such structures, sites, and areas.[8] Simply put, the goal of the facially preempted provisions of the NPO is to keep landlords in the rental business, while the goal of the LPO is to preserve buildings for

---

[8]The LPO is found at BMC chapter 3.24. Section 3.24.010 sets out the purposes of the ordinance as follows:

"A. It is found that structures, sites and areas of special character or special historical, architectural or aesthetic interests or value have been and continue to be unnecessarily destroyed or impaired, despite the feasibility of preserving them.

"B. It is further found that prevention of such needless destruction and impairment is essential to the health, safety and general welfare of the citizens of the city.

"C. The purpose of this legislation is to promote the health, safety and general welfare of the citizens of the city through:

"1. The protection, enhancement, perpetuation and use of structures, sites and areas that are reminders of past eras, events and persons important to local, state or national history, or which provide significant examples of architectural styles of the past, or are landmarks in the history of architecture, or which are unique and irreplaceable assets to the city and its neighborhoods, or which provide for this generation and future generations examples of the physical surroundings in which past generations lived;

"2. The development and maintenance of appropriate settings and environments for such structures, in such sites and areas;

"3. The enhancement of property values, the stabilization of neighborhoods and areas of the city, and the increase of economic and financial benefits to the city and its inhabitants;

historical or aesthetic reasons. Thus, the demolition policies contained in the LPO have nothing to do, either directly or indirectly, with in any way regulating or governing the right or power of a landowner to cease offering units of property for rent or lease, and may be implemented through the nonpreempted provisions of the NPO regulating demolition based on considerations of public interest.

The LPO is a classic example of the kind of local land use regulation and zoning ordinance consistently upheld under the police power. (*Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1 [94 S.Ct. 1536, 39 L.Ed.2d 797]; *Berman* v. *Parker* (1954) 348 U.S. 26 [75 S.Ct. 98, 99 L.Ed. 27]; *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303]; *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 886 [218 Cal.Rptr. 303, 705 P.2d 876]; *Groch* v. *City of Berkeley, supra,* 118 Cal.App.3d at pp. 522-526; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 140 [130 Cal.Rptr. 465, 550 P.2d 1001]; cf. *League for Protection of Oakland's etc. Historic Resources* v. *City of Oakland, supra,* 52 Cal.App.4th at pp. 903-910.) This kind of local control over the use of property subsequent to its removal from the rental housing market is simply unaffected by the Ellis Act. The Ellis Act explicitly states that it is not intended to interfere with local governmental authority over the regulation of land use. (§§ 7060.1, 7060.7.) As emphasized in *Javidzad,* the Ellis Act does not automatically entitle an owner to demolish units or alter the use of property. Local governments retain their regulatory police powers with respect to land use. (*Javidzad, supra,* 204 Cal.App.3d at p. 531.) On its face, therefore, the LPO is not in conflict with or preempted by the Ellis Act.

The LPO, like any other environmental, historical preservation, or land use regulation, may directly affect a landowner's right to alter, demolish, or construct a building on a particular parcel of property. However, the fact the LPO permit procedure may in a given case prevent the demolition of a particular residential building does not put the LPO in conflict with the Ellis Act. Unlike the ordinances at issue in *Yarmark, Javidzad,* and *Lincoln Place,* and the NPO itself, the LPO does not place any burdens on landlords who seek to exercise their right under the Ellis Act to withdraw their property from the rental market, and themselves quit the residential rental housing business. The purpose of the Ellis Act is to protect a landowner's right to leave the rental housing market without hindrance from the government. Contrary to the Church's position, there is nothing in the LPO that would

"4. The preservation and encouragement of a city of varied architectural styles, reflecting the distinct phases of its history . . . ; [and]

"5. The enrichment of human life in its educational and cultural dimensions in order to serve spiritual as well as material needs by fostering knowledge of the living heritage of the past."

*require* the owner of a residential building saved from demolition by the LPO for historical, architectural or aesthetic reasons, to continue to offer the units or apartments in the building *for rent.* In such a situation, the building owner may convert units withdrawn from the rental market to condominiums for sale or modify the building for nonresidential purposes, consistent with other applicable zoning and land use regulations.

We conclude the trial court was incorrect in ruling the Ellis Act "provides landlords with the right . . . to demolish those structures removed from the rental market." As so phrased, the trial court's ruling would grant landlords a special exemption from local land use control over any building that was once used for residential rental purposes, but has since been removed from the market. This is in conflict with the explicit provisions of the Ellis Act leaving to local governments the power to regulate the use of land *subsequent* to its removal from the rental market. (*Javidzad, supra,* 204 Cal.App.3d at p. 531.)

More broadly, the trial court's statement that "the issuance of [a] demolition permit is guaranteed by the Ellis Act as a ministerial action" is in error. This statement fails to take into account those circumstances in which a demolition permit application may be subject to discretionary review on the basis of land use regulations dealing with environmental or historical preservation concerns, but having nothing to do with the provision or maintenance of rental housing. The Ellis Act is not intended to interfere with the police power of local governments to regulate land use. It is implicated only when the conditions or regulations sought to be imposed on a demolition permit would restrict a landlord's right to remove units from the rental market and leave the rental business. (*Javidzad, supra,* 204 Cal.App.3d at p. 531.)

Thus, the trial court erred in ruling the City may not require the preparation of an EIR pursuant to CEQA or exercise its discretion to deny issuance of a demolition permit under the LPO based on the historic or aesthetic value of the building to be demolished. The Ellis Act has no impact on the continuing power of local governments to exercise such discretionary regulatory oversight over land use for purposes having nothing to do with restricting landlords from leaving the rental market. As long as a demolition permit process is not conditioned on or tied to a regulation restricting the right to withdraw residential units from the rental market, a government agency retains such discretion to deny a demolition permit under its police power with respect to land use. Certainly in cases where the building in question has already been removed from the rental market, the Ellis Act has no effect on a local government's discretionary oversight of its demolition permit procedure.

We hold that as long as the City's demolition permit process is not conditioned on or tied to a permit to withdraw residential units from the

rental market, or the building in question has already been removed from the rental market, the City retains its discretion to deny a demolition permit under its police power with respect to land use. We therefore reverse the trial court's ruling that the City may not require the preparation of an EIR pursuant to CEQA, or otherwise exercise its discretion to deny issuance of a demolition permit under the LPO and the NPO based on the historical, architectural, aesthetic, landmark or other environmental status of the building to be demolished.[9]

## DISPOSITION

The judgment is reversed with respect to the 2d, 10th, 12th and 13th causes of action insofar as it holds the City is barred by the Ellis Act from exercising discretionary review of the Church's application for a demolition permit under the NPO, LPO and CEQA with respect to the historic or aesthetic value of the subject Building and Property, without any regard to considerations as to future construction of residential units on the Property, the habitability of the Building sought to be demolished, or the provision and maintenance of rental housing in the City. In all other respects, the judgment is affirmed.

Each party shall bear its own costs on appeal.

Phelan, P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied January 7, 1998, and the opinion was modified to read as printed above.

---

[9]The City has not challenged the trial court's ruling that the City's designation of the Building as a "landmark" was barred by section 37361. The impact of that provision is therefore not at issue on this appeal. We note, however, that the City designated the Building a "structure of merit" in January 1987, well before the effective date of the amendments to section 37361 relating to noncommercial property owned by religious institutions. This designation of the Building as a "structure of merit" has never been challenged by the Church, and is unaffected by the relevant language in section 37361. Under the LPO, "[n]o person shall carry out or cause to be carried out on a designated landmark, in a designated historic district *or structure of merit*, any construction, alteration, *or demolition* for which a city permit is required, without approval by the [Landmarks] commission . . . ." (BMC, § 3.24.200, italics added.) Thus, the LPO is fully applicable to the Building as a structure of merit, whether or not subsequently it was properly designated a landmark, and the trial court's ruling in this regard has no effect on the City's power to regulate the demolition of the Building, as a structure of merit, under the LPO.