[No. B206102. Second Dist., Div. Four. July 22, 2009.]

PALMER/SIXTH STREET PROPERTIES, L.P., et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

1398

## Counsel

Rockard J. Delgadillo, City Attorney, Jeri L. Burge, Assistant City Attorney, Tayo A. Popoola and Michael J. Bostrom, Deputy City Attorneys, for Defendant and Appellant.

ACLU Foundation of Southern California, Peter Bibring, Peter J. Eliasberg, Mark D. Rosenbaum; Western Center on Law & Poverty, Richard Rothschild, Lynn Martinez; Legal Aid Foundation of Los Angeles, Christian Abasto; California Affordable Housing Law Project, Public Interest Law Project,

Michael Rawson; Public Counsel Law Center, Shashi Hanuman; and Bet Tzedek Legal Services and Michelle Marie Kezirian for Southern California Association of Non-Profit Housing and The Association of Community Organizations for Reform Now as Amici Curiae on behalf of Defendant and Appellant.

Costell & Cornelius Law Corporation, Jeffrey Lee Costell, Alexandre Ian Cornelius, Mitchell E. Rishe and Sean M. Cronin for Plaintiffs and Respondents.

## OPINION

**SUZUKAWA, J.**—The superior court issued a writ of mandate that precludes appellant City of Los Angeles (the City) from enforcing an affordable housing ordinance against a mixed use project that is being developed by respondents Palmer/Sixth Street Properties, L.P., and Geoffrey Palmer (jointly, Palmer). The superior court concluded that, as applied to Palmer's proposed project, the affordable housing ordinance conflicts with and is preempted by the vacancy decontrol provisions of the Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.50 et seq.; the Costa-Hawkins Act or the Act), which allows residential landlords to set the initial rent levels at the commencement of a tenancy. The City has appealed from the judgment, which we affirm.

## BACKGROUND

In 1991, the City adopted a specific plan (the Plan) for development projects[1] within the area located immediately west of the Harbor Freeway near downtown Los Angeles called Central City West (the Area). In relevant part, section 11.C of the Plan (section 11.C) imposes affordable housing requirements on residential and mixed use[2] projects of more than 10 dwelling

---

[1] The Plan defines a "project" as "[t]he construction, erection, addition to or alteration of any building or structure, or a use of land or change of use on a lot located in whole or in part within the Specific Plan area, which requires the issuance of a grading permit, foundation permit, building permit, sign permit or use of land permit after the effective date of this Specific Plan. A Project does not include remodeling of a building which does not increase the number of Trips, as determined in writing by the Department of Transportation, or does not increase the floor area." (Plan, § 4, Definitions.)

[2] The Plan defines a "mixed use" project as "[a]ny Project which combines a commercial use with a residential use, either in the same building or in separate buildings on the same lot or lots." (Plan, § 4, Definitions.)

Although the Plan also imposes affordable housing requirements on commercial and industrial projects, those requirements are beyond the scope of this opinion, which is limited to the mixed use project at issue.

units per lot.[3] According to section 2.D of the Plan, the City adopted these requirements in order to protect the Area's "existing residential community from further displacement, replace dwelling units previously removed from the Specific Plan area, and provide new housing in proportion to the need, by household size and income, associated with the existing community and new jobs generated in the Plan area."[4]

This litigation concerns the City's conditional approval of a mixed use project (Piero II or the project) that Palmer plans to build within the Area. The site is currently used as a parking lot, but it previously contained a 60-unit low-income apartment hotel that was demolished in 1990. The City conditionally approved the project subject to Palmer's compliance with section 11.C's affordable housing requirements, but Palmer contends the requirements conflict with and are preempted by the Costa-Hawkins Act. As previously mentioned, the Costa-Hawkins Act's vacancy decontrol provisions allow residential landlords to set the initial rent levels at the commencement of a tenancy. The Plan, on the other hand, requires either the construction of affordable housing units that are subject to rent restrictions for the life of the units or for 30 years, whichever is greater, or the payment of an in lieu fee that the City will use to build affordable housing units elsewhere. The dispositive issue, both below and on appeal, is whether the City's application of section 11.C's affordable housing requirements to the Piero II project conflicts with and is preempted by the Act.

## I. *Section 11.C's Affordable Housing Requirements*

Section 11.C.2.a requires applicants for multiple-family residential or mixed use projects to comply with whichever of the following will result "in the greater number of affordable dwelling units: [¶] 1) Document and replace, on a one-for-one basis in the form of new dwelling unit construction, Low

---

[3] Section 11.C.2.e states that "[m]ultiple-family residential Projects consisting of 10 dwelling units or fewer shall be exempt from the requirements of this Subdivision."

[4] In its opening brief, the City described the Area's need for affordable housing as follows: "Before adopting the Specific Plan, the City conducted a study regarding the need for affordable housing in the Specific Plan area. The study concluded that from 1984 to 2010 more than 50% of the households in the Specific Plan Area had, and would continue to have, income below $10,000 per year. As of 1980, that income level was considered to be 'below the poverty level.' Based on these and other facts, the City determined that the 'provision of affordable housing is critical to both protection of the existing residential community and balancing housing costs with employment income.' [¶] The City also found that demolition of affordable housing in the Specific Plan area was creating a very serious problem. 'According to Rent Stabilization Division records, between 1984 and 1990, 1,233 rental units have been demolished.' A study of the actual conditions on the ground revealed that the problem was even more dire: the 'housing stock ha[d] declined by one-third, or more than twice as much as demolition permit figures indicate.' " (Record citations omitted.)

and Very Low Income Dwelling Units[5] and/or guest rooms demolished on the lot or lots on or after February 14, 1988; or [¶ 2) If no dwelling units were demolished on the lot or lots on or after February 14, 1988, a Project Applicant shall designate [and] reserve a total of 15% of the dwelling unit[]s within the Project as Low [I]ncome Dwelling Units."

Alternatively, if a multiple family residential project applicant does not wish to comply with the Plan's replacement and inclusionary dwelling requirements, section 11.C provides for the payment of an "in lieu" fee. Section 11.C describes the in lieu fee as follows: "In lieu of the requirements of this Subdivision, a multiple-family residential Project Applicant may pay a fee. [¶ 1) The in lieu fee for a required Very Low Income Dwelling Unit shall be $100,576.14 per unit. [¶ 2) The in lieu fee for a required Low Income Dwelling Unit shall be $78,883.41 per unit."

The Plan limits the monthly rents that may be charged for any required affordable housing unit that is built under section 11.C. According to section 11.E of the Plan, the monthly rent for low-income dwelling units "shall not exceed 30% of 80% of the median monthly income for persons or families residing in the Los Angeles Standard Metropolitan Statistical Area," and for very-low-income dwelling units, the monthly rent "shall not exceed 30% of 50% of the median monthly income." Section 11.E further provides that these rent restrictions shall remain in place, through the use of deed restrictions, "for the life of the dwelling units or for 30 years, whichever is greater."

II. *Palmer's Project Application and Waiver Request*

In 2006, Palmer applied for approval of the Piero II project, which will include "350 residential units and 9,705 square feet of commercial space on 2.84 acres, consisting of 11 separate, contiguous lots." Because the project site formerly contained a 60-unit low-income apartment hotel that was demolished in July 1990, the City concluded that the project falls within the scope of section 11.C's replacement dwelling requirements.

Palmer requested a waiver of section 11.C's affordable housing requirements. In support of its waiver request, Palmer pointed out that the cost of providing 60 replacement low-income dwelling units "would reduce the amount of loan proceeds otherwise available to the project by approximately

---

[5] The Plan defines a "low income dwelling unit" as a unit that "is rented or sold to and occupied by persons or families whose annual income does not exceed 80% of the median annual income for persons or families residing in the Los Angeles Standard Metropolitan Statistical Area." It defines a "very low income dwelling unit" as a unit that is rented or sold to and occupied by those "whose annual income does not exceed 50% of the median annual income."

$10 million, which would render the project economically infeasible."[6] Palmer also stated that because the site is "currently being used as a parking lot[,] no existing dwelling units will be demolished or removed as a result of the project. Instead, the [project] will provide an additional 350 units to the existing supply of rental housing in the area, which will enhance the housing opportunities for people who work in downtown."

Palmer objected that applying section 11.C's affordable housing requirements to the project would violate the Costa-Hawkins Act. Palmer argued that the Costa-Hawkins Act "pre-empts the area of rental control regulation and provides, among other things, that an 'owner of residential real property may establish the initial and all subsequent rental rates for a dwelling or a unit . . . [which] has a certificate of occupancy issued after February 1, 1995.' [Civ. Code, § 1954.52, subd. (a)(1).]" Palmer contended that section 11.C's affordable housing requirements are "exactly the type of local regulation that the Costa-Hawkins Act was designed to prohibit, as it would reduce, if not entirely eliminate, the economic motivation to produce the very rental housing that the Costa-Hawkins Act seeks to encourage, as it would interfere with applicant's right to set initial rents on all of the new apartments produced, and all future rental increases for the property."

Palmer further argued that because it was not "applying for any additional incentives" or receiving "any form of any government support," the project should be exempted from section 11.C's affordable housing requirements. (See Civ. Code, § 1954.52, subd. (b) [the Costa-Hawkins Act "does not apply where the owner has otherwise agreed by contract with a public entity in consideration for a direct financial contribution or any other forms of assistance specified in Chapter 4.3 (commencing with Section 65915) of Division 1 of Title 7 of the Government Code"].) Although both the Costa-Hawkins Act and section 11.C permit developers to obtain density bonuses,[7] Palmer pointed out that it has no need for a density bonus, because the project involves "approximately 40% fewer" units than are allowed by the zoning ordinances.

---

[6] Section 11.C.3 authorizes the city council to grant administrative relief from section 11.C's replacement dwelling unit requirements, either under the terms of specified earthquake hazard reduction ordinances, or "in cases of extreme hardship duly established to the satisfaction of the City Council."

[7] A density bonus is an incentive, in the form of a density increase, which local governments provide in return for a developer's *voluntary* inclusion of affordable housing units within a project. (See Gov. Code, §§ 65915–65918.) The term "density bonus" is defined in Government Code section 65915, subdivision (f) as "a density increase over the otherwise maximum allowable residential density as of the date of application by the applicant to the city, county, or city and county. The applicant may elect to accept a lesser percentage of density bonus. The

## III. *The City's Administrative Rulings*

The local planning commission, the planning and land use management committee, and the city council reviewed Palmer's waiver request. At each level, the waiver was denied on the ground that the site formerly contained a 60-unit low-income apartment hotel that was destroyed within the time period covered by the Plan.

The planning commission conditionally approved the project subject to section 11.C's affordable housing requirements, as stated in condition 10 of the project approval. Under condition 10, Palmer must (1) provide 60 replacement low-income dwelling units, either on or offsite, or pay an in lieu fee of $96,182.17 per unit for 60 units, for a total of $5,770,930.20;[8] and (2) execute a "Covenant and Agreement" to maintain the rent restrictions set forth in section 11.E of the Plan for at least 30 years after the project's certificate of occupancy is issued.[9]

The City's planning and land use management committee reviewed the administrative record and, after conducting a public hearing, sustained condition 10 of the project approval. The city council also considered the matter and, after conducting a hearing, adopted the committee's recommendation and denied the administrative appeal.

## IV. *This Judicial Action*

Following the denial of its administrative appeal, Palmer filed the present complaint for administrative writ of mandate, damages, and declaratory and

---

amount of density bonus to which the applicant is entitled shall vary according to the amount by which the percentage of affordable housing units exceeds the percentage established in subdivision (b)."

Section 11.C.2.f.(1) states that "[a] Project Applicant for a multiple-family residential or Mixed Use Project subject to the requirements of Subsection C.2.a.(2) of this Section shall be eligible for a density bonus." The Costa-Hawkins Act provides that the Act "does not apply where the owner has otherwise agreed by contract with a public entity in consideration for a direct financial contribution or any other forms of assistance specified in Chapter 4.3 (commencing with Section 65915) of Division 1 of Title 7 of the Government Code."

[8] According to the record, the "in lieu" fee was adjusted in 2006 to $122,632.02 for very-low-income dwelling units, and $96,182.17 for low-income dwelling units.

[9] Condition 10 also relaxed some of section 11.C's requirements. For example, section 11.D.1.a specifies that for mixed use projects, at least 30 percent of the required replacement dwelling units must be two bedrooms or larger, and section 11.D.3 states that a minimum of 30 percent of the required low-income dwelling units shall be two bedrooms or larger. However, condition 10 stated that "Notwithstanding Section 11.D.3 of the Central City West Specific Plan to the contrary, the Low Income Dwelling Units provided on-site may be composed of: studio apartments, 1-bedroom apartments, and/or 'dual master' apartments."

injunctive relief.[10] In the mandamus claim, which is the only claim at issue on appeal, Palmer alleged that the application of section 11.C's affordable housing requirements to the project violated both the Costa-Hawkins Act and the Mitigation Fee Act. (Gov. Code, § 66000 et seq.) The superior court stayed the other causes of action pending a hearing on the mandamus claim.

Prior to the mandamus hearing, leave to intervene in the action was requested by associations of affordable housing tenants (the Association of Community Organizations for Reform Now (ACORN)) and nonprofit developers (the Southern California Association for Non-Profit Housing (SCANPH)). Palmer argued that the request should be denied as moot because, regardless of the outcome of the mandamus proceeding, it would not be building any low-income housing units, either within the project or elsewhere. To clarify this point, Palmer filed an amended complaint stating that if it did not obtain relief from condition 10 of the project approval, it would pay the in lieu fee rather than build the required affordable housing units. The trial court denied the intervention request, which is the subject of a related appeal by ACORN and SCANPH.[11] (*Palmer/Sixth Street Properties, L.P. v. City of Los Angeles* (July 22, 2009, B200813) [nonpub. opn.].)

In the mandamus proceeding, Palmer argued that applying section 11.C's affordable housing requirements to the project would violate the Costa-Hawkins Act. Palmer stated below that "the Costa-Hawkins Act indicates a clear intent on the part of the state legislature to preempt all local rent control laws. *See Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles* (2006) 136 Cal.App.4th 119, 130 [38 Cal.Rptr.3d 575] (holding that the Costa-Hawkins Act 'preempts local rent control by permitting landlords to set the initial rent for vacant units'). As such, the [replacement dwelling requirements] of the Specific Plan, which impose restrictions on the initial and subsequent rents Petitioner may charge for [Piero II] units, violates and is preempted by Costa-Hawkins Act."[12]

---

[10] Palmer also filed a concurrent federal district court action that, according to Palmer's respondent's brief, involves "essentially the same constitutional claims as were asserted in Palmer's Superior Court Complaint." According to Palmer, the federal action was stayed pending the outcome of this action.

[11] ACORN and SCANPH have filed an amicus curiae brief in this appeal in support of the City. Palmer has filed a response to their brief.

[12] Additionally, Palmer argued that section 11.C's affordable housing requirements violated the Mitigation Fee Act because it "prohibits a local agency from imposing an exaction (here, the [replacement dwelling provisions] requiring the setting aside or building of 60 affordable units or the payment of in lieu fees of $96,182.17 per unit) as a condition of approval of a local development project, unless the local agency makes a determination that there is: [¶] (i) 'a reasonable relationship between the fee's use and the type of development project on which the fee is imposed' [Gov. Code, § 66001, subd. (a)(3)]; [¶] (ii) 'a reasonable relationship between the *need for the public facility* and the *type of development project* on which the fee is

The superior court concluded that applying section 11.C's affordable housing requirements to the project would be fatally inconsistent with the Costa-Hawkins Act. The superior court rejected the City's alternative argument to enforce section 11.C's "in lieu" fee provision as a stand-alone fee provision, while striking the preempted provisions from the rest of the ordinance. The superior court concluded that the fee provision was so inextricably intertwined with the preempted provisions of the ordinance that severing the fee provision was not a viable option.

Following Palmer's dismissal of the nonmandamus claims, the superior court entered a judgment: (1) requiring the City to set aside, eliminate, and not enforce condition 10 of the project approval; and (2) prohibiting the City from applying section 11.C's affordable housing requirements to the Piero II project. The City has appealed from the judgment.

## DISCUSSION

### I. *Standard of Review*

Although the parties disagree as to whether the mandamus claim is properly characterized as a claim for traditional (Code Civ. Proc., §§ 1084–1094) or administrative (*id.*, § 1094.5) mandamus, in either case the standard of review would be the same because there are no disputed issues of fact. (*Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 107 [73 Cal.Rptr.2d 523].) As the issues regarding the Costa-Hawkins Act present pure questions of law, we will review the trial court's decision de novo. (*Bostean*, at p. 107; *Pellerin v. Kern County Employees' Retirement Assn.* (2006) 145 Cal.App.4th 1099, 1105 [52 Cal.Rptr.3d 201].)

### II. *Preemption by the Costa-Hawkins Act*

■ The Costa-Hawkins Act, which was enacted in August 1995, "established 'what is known among landlord-tenant specialists as "vacancy decontrol," declaring that "[n]otwithstanding any other provision of law," all residential landlords may, except in specified situations, "establish the initial rental rate for a dwelling or unit." (Civ. Code, § 1954.53, subd. (a).)' (*DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 41 [99 Cal.Rptr.2d 366].) The

---

imposed' [Gov. Code, § 66001, subd. (a)(4)]; and/or [¶] (iii) '[a] reasonable relationship between the *amount of the fee* and the *cost of the public facility attributable to the development* on which the fee is imposed' [Gov. Code, § 66001, subd. (b)].' (Emphasis added.)" The trial court did not reach this issue.

effect of this provision was to permit landlords 'to impose whatever rent they choose at the commencement of a tenancy.' (*Cobb v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (2002) 98 Cal.App.4th 345, 351 [119 Cal.Rptr.2d 741].)" (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1237 [63 Cal.Rptr.3d 398, 163 P.3d 89].)

The City contends that the judgment must be reversed because the affordable housing requirements that were imposed in condition 10 of the project approval do not conflict with the Costa-Hawkins Act. For the reasons that follow, we disagree.

### A. General Preemption Principles

In *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897–898 [16 Cal.Rptr.2d 215, 844 P.2d 534], our Supreme Court stated the following general principles governing preemption analysis:

██ "Under article XI, section 7 of the California Constitution, '[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' [Fn. omitted.]

" 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' (*Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 [218 Cal.Rptr. 303, 705 P.2d 876]; accord, e.g., *IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 90 [2 Cal.Rptr.2d 513, 820 P.2d 1023]; *People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 484 [204 Cal.Rptr. 897, 683 P.2d 1150]; *Lancaster v. Municipal Court* (1972) 6 Cal.3d 805, 807 [100 Cal.Rptr. 609, 494 P.2d 681].)

" 'A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' (*Candid Enterprises, Inc. v. Grossmont Union High School Dist., supra*, 39 Cal.3d at p. 885, which quotes, without citations, *People ex rel. Deukmejian v. County of Mendocino, supra*, 36 Cal.3d at p. 484, which in turn quotes, with citations, *Lancaster v. Municipal Court, supra*, 6 Cal.3d at pp. 807–808; accord, e.g., *IT Corp. v. Solano County Bd. of Supervisors, supra*, 1 Cal.4th at p. 90; *Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 423 [261 Cal.Rptr. 384, 777 P.2d 157]; *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 290 [219 Cal.Rptr. 467, 707 P.2d 840].)

"Local legislation is 'duplicative' of general law when it is coextensive therewith. (See *In re Portnoy* (1942) 21 Cal.2d 237, 240 [131 P.2d 1] [finding 'duplication' where local legislation purported to impose the same criminal prohibition that general law imposed].)

"Similarly, local legislation is 'contradictory' to general law when it is inimical thereto. (See *Ex parte Daniels* (1920) 183 Cal. 636, 641–648 [192 P. 442] [finding 'contradiction' where local legislation purported to fix a lower maximum speed limit for motor vehicles than that which general law fixed].)

■ "Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area (see, e.g., *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist., supra,* 39 Cal.3d at p. 886), or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality (*In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809], 'overruled' on another point, *Bishop* v. *City of San Jose* [(1969)] 1 Cal.3d [56,] 63, fn. 6 [81 Cal.Rptr. 465, 460 P.2d 137]; accord, e.g., *IT Corp.* v. *Solano County Bd. of Supervisors, supra,* 1 Cal.4th at pp. 90–91; *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist., supra,* 49 Cal.3d at p. 423; *Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at pp. 292–293; *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist., supra,* 39 Cal.3d at p. 886; *People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 485)."

B. *The Preemption Issue Was Not Rendered Moot in This Case*

The City contends that the preemption issue was rendered moot when Palmer amended the complaint to allege that if condition 10 is upheld, Palmer will pay the in lieu fee rather than build the required affordable housing units. The City argues that "Palmer cannot take the issue of [section 11.C's] rental limitations out of the litigation in order to deprive proposed intervenors of standing, and then reinsert the issue in the case when litigating against the City. Once Palmer irrevocably elected to pay the fees, there was no longer

even the potential danger that [section 11.C] would have any impact on the initial rents at the Piero II. As such, Palmer's Costa-Hawkins claim became moot, and the trial court should have declined to entertain it. *Platt v. Wells Fargo Bank Am. Tr. Co.*, 222 Cal.App.2d 658, 670 [35 Cal.Rptr. 377] (1963) (equity does not call for the determination of 'conjectural or premature matters which do not constitute actual or present controversies . . . '); *Branick v. Downey Sav. & Loan Ass'n*, 39 Cal.4th 235, 243 [46 Cal.Rptr.3d 66, 138 P.3d 214], (2006) ('rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court'). ([C]itations and quotations omitted.)"

We disagree that the issue was rendered moot by the amended pleading. The amendment simply clarified that an adverse ruling on the complaint would result in the payment of the in lieu fee rather than the construction of low-income housing units. This clarification did not constitute a waiver or forfeiture of any of the complaint's substantive allegations. Accordingly, we reject the City's argument.

### C. *Other Preemption Cases*

Although we have found no case directly on point, we note that other courts have invalidated other rent control provisions that conflicted with the Costa-Hawkins Act. For example, in *Bullard v. San Francisco Residential Rent Stabilization Bd.* (2003) 106 Cal.App.4th 488 [130 Cal.Rptr.2d 819] (*Bullard*), the appellate court overturned a provision that permitted evictions if the landlord was reclaiming a rent-controlled apartment as the landlord's principal residence, provided the landlord offered the displaced tenant another unit at a regulated rent. The appellate court rejected the tenant's argument that the rent restriction was a permissible form of local eviction control under the Costa-Hawkins Act, which allows public entities to regulate and monitor the grounds for eviction. (Civ. Code, § 1954.53, subd. (e) ["Nothing in this section shall be construed to affect any authority of a public entity that may otherwise exist to regulate or monitor the grounds for eviction."].) The appellate court concluded that because a rent restriction is not a ground for eviction, it could not be justified as a form of eviction control: "Had the Legislature intended to preserve local authority to control rent following evictions, we do not believe it would have spoken in terms of the 'grounds for eviction,' which simply do not include the amount of rent a landlord may charge after evicting a tenant. The San Francisco rent control ordinance, by purporting to limit the amount of rent a landlord may charge for a replacement unit following an owner move-in eviction, directly contradicts state law providing: 'Notwithstanding any other provision of law, an owner of residential real property may establish the initial rental rate for a dwelling or unit . . . .' (Civ. Code, § 1954.53, subd. (a).) Therefore, the challenged

provision is preempted. (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 141 [130 Cal.Rptr. 465, 550 P.2d 1001]; *Sherwin-Williams Co. v. City of Los Angeles*[, *supra*,] 4 Cal.4th 893, 897–898 . . . .)" (*Bullard, supra,* 106 Cal.App.4th at pp. 492–493.)

In *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra,* 136 Cal.App.4th 119 (*Apartment Assn.*), the appellate court overturned a Los Angeles rent control ordinance that preserved certain rent restrictions indefinitely. The ordinance required landlords, following the termination of their "Section 8 housing contract with the City's Housing Authority," to continue charging the restricted "rent under the former contract, without any limitation as to time." (*Id.* at p. 122.) The Costa-Hawkins Act, on the other hand, provides only a 90-day period during which the tenant may continue paying the prior restricted rent. (Civ. Code, § 1954.535.) The appellate court concluded that the ordinance's unlimited rent restriction conflicted with and was preempted by the Costa-Hawkins Act, stating: "The Legislature, in Civil Code section 1954.535, specified the period of time a tenant's rent payment is frozen following termination or nonrenewal of a Section 8 agreement—90 days following receipt of notice of termination or nonrenewal. Because the Legislature has fully occupied the field in this area, Municipal Code section 151.04.B., the 2002 Ordinance, which purports to confer greater protections upon the tenant by freezing the tenant's payment beyond 90 days, and apparently indefinitely, is preempted." (*Apartment Assn.,* at p. 132.)

In contrast with the above cases, Division Three of this district recently concluded that the Costa-Hawkins Act did not preempt the City's rent recontrol ordinance, which "provides that if a landlord demolishes residential property subject to City's rent control law, and builds new residential rental units on the same property within five years, the newly constructed units are also subject to the rent control law." (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 17 [92 Cal.Rptr.3d 441].) The ordinance was authorized by the Ellis Act (Gov. Code, § 7060 et seq.), which predates the Costa-Hawkins Act. The Ellis Act, which allows residential landlords to evict their tenants and go out of business if they comply with certain procedural requirements, was amended to include recontrol provisions that prevent landlords from evicting tenants under the pretext of going out of business and then re-leasing the units at an unregulated rental rate within the next five years. (Gov. Code, § 7060.2, subd. (d).) Division Three concluded that the Costa-Hawkins Act neither impliedly repealed the Ellis Act (Gov. Code, § 7060.2, subd. (d)), nor preempted the ordinance. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra,* 173 Cal.App.4th at pp. 25–30.) In this case, however, the Ellis Act does not apply because more than five years have elapsed since the former residential rental units were demolished on the site.

D. *As Applied to the Project in Condition 10, Section 11.C's Requirements Conflict With and Are Preempted by the Costa-Hawkins Act*

■ The Legislature in the Costa-Hawkins Act clearly stated that "[n]otwithstanding any other provision of law," all residential landlords may, except in specified situations, "establish the initial rental rate for a dwelling or unit." (Civ. Code, § 1954.53, subd. (a).) Section 11.C, on the other hand, requires Palmer to provide 60 affordable housing units at regulated rent levels that must be preserved for the life of the dwelling units or 30 years, whichever is greater.

A local ordinance is " 'contradictory' to general law when it is inimical thereto." (*Sherwin-Williams Co. v. City of Los Angeles, supra*, 4 Cal.4th at p. 898.) We find section 11.C's affordable housing requirements to be hostile or inimical to Civil Code section 1954.53 by denying Palmer the right to establish the initial rental rates for the affordable housing units that are required to be built under section 11.C, and by preserving their regulated rent levels for 30 years or the life of the units, whichever is greater.

Although the Costa-Hawkins Act does not apply when "[t]he owner has otherwise agreed by contract with a public entity [to build affordable housing] in consideration for a direct financial contribution or any other forms of assistance specified in Chapter 4.3 (commencing with Section 65915) of Division 1 of Title 7 of the Government Code" (Civ. Code, § 1954.53, subd. (a)(2)), there is no such agreement in this case. Because Palmer has refused to build affordable housing units under any circumstances, the issue is whether requiring Palmer's involuntary compliance with section 11.C's affordable housing requirements is hostile or inimical to Palmer's right under the Costa-Hawkins Act to establish the initial rental rates for the project's dwelling units. We conclude that it is.

■ Under the plain meaning rule of statutory construction, if the language of the statute " 'is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it. [Citation.] "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citation.]' (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].)" (*El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153, 1161 [118 Cal.Rptr.2d 15].) Applying this rule to Civil Code section 1954.53, subdivision (a), we find that it is clear and unambiguous. According to its plain language, the Costa-Hawkins Act provides in relevant part that, "[n]otwithstanding any other provision of law," all residential landlords may, except in specified

situations, "establish the initial rental rate for a dwelling or unit." (Civ. Code, § 1954.53, subd. (a).) Forcing Palmer to provide affordable housing units at regulated rents in order to obtain project approval is clearly hostile to the right afforded under the Costa-Hawkins Act to establish the initial rental rate for a dwelling or unit.

The City argues that section 11.C does not conflict with the Costa-Hawkins Act because section 11.C is not a rent control statute that governs the entire rental housing market. According to the City, section 11.C does not violate the Costa-Hawkins Act because it simply mandates either the replacement of the 60 affordable units that were demolished on the project site in 1990, or the payment of an in lieu fee. We are not persuaded. Section 11.C must be read in conjunction with section 11.E, which directly conflicts with the Costa-Hawkins Act's vacancy decontrol provisions by imposing rent restrictions on the units required to be built under section 11.C. Not only does section 11.E clearly restrict the initial rents for those units, but it imposes deed restrictions to control the rents "for the life of the dwelling units or for 30 years, whichever is greater." Accordingly, it is plain that the Plan imposes rent restrictions that conflict with and are inimical to the Costa-Hawkins Act, even if those restrictions apply only to a portion of the residential units within the project and does not control the rents for the entire project.

The City further argues that section 11.C's in lieu fee provision does not conflict with the Costa-Hawkins Act, which does not mention impact fees. In our view, however, the in lieu fee provision does not eliminate the conflict between the Costa Hawkins Act and the Plan's affordable housing requirements. Although the fee option provides an alternative to the Plan's affordable housing requirements, because the fee amount is based solely on the number of affordable housing units that a developer must provide under the Plan, the Plan's affordable housing requirements and in lieu fee option are inextricably intertwined. The objective of section 11.C is not to impose fees, but to impose *affordable housing requirements that may be satisfied by paying fees* that the City concedes are "*in lieu* of the set-aside provisions, not the other way around."[13] Because the affordable housing requirements conflict with and are inimical to the Costa-Hawkins Act, it necessarily follows that the in lieu fee provision, which exists only within the context of the preempted affordable housing requirements, is also preempted by the Act.

---

[13] The City argues that focusing on the fact that the in lieu fee provision follows the set-aside provision "does nothing more than elevate form over substance. It contends the ordinance would not violate the Costa-Hawkins Act if the set-aside provision were an in lieu option to the fee. We are not persuaded. The only way the builder could avoid the fee would be to permit itself to be bound by a set-aside provision that is illegal under the Act. Thus, the fee would still exist as part of an overall plan that is preempted by the Act.

Finally, the City asserts that because Palmer has the option of building fewer than 10 units per lot, which would remove the project from the scope of section 11.C's affordable housing requirements, there is no conflict between the affordable housing requirements and the Costa-Hawkins Act. This contention ignores the fact that because the project complies with applicable zoning laws, Palmer has no need for a density bonus or other assistance in return for complying with section 11.C's affordable housing requirements. That Palmer could avoid section 11.C's requirements by limiting the number of residential units per lot does not eliminate the conflict that exists between the Plan and the Act.

III. *The In Lieu Fee Provision Is Not Severable*

■ " 'Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable. . . . . Such a clause plus the ability to mechanically sever the invalid part while normally allowing severability, does not conclusively dictate it. The final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable.' (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605]; *Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 190 [185 Cal.Rptr. 260, 649 P.2d 902].) (Interior quotation marks and citations omitted.)" (*Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247].)

The City alternatively contends that under the Plan's severability clause,[14] the valid portion of the Plan's in lieu fee provision should be severed from any invalid portion of the Plan's affordable housing requirements. The severability clause does not apply, however, because, for the reasons previously stated, the in lieu fee provision is inextricably intertwined with the invalid portion of the Plan's affordable housing requirements. Severing the invalid in lieu fee provision from the invalid affordable housing requirements would serve no useful purpose.[15]

---

[14] Section 18 of the Plan provides: "If any provision of this Specific Plan or the application thereof to any person, property or circumstances, is held invalid, the remainder of this Specific Plan or the application of such provisions to other persons, property or circumstances shall not be affected."

[15] In light of our determination that the in lieu fee option is preempted by the Costa-Hawkins Act, we need not reach the City's remaining contention that the fee option does not violate the Mitigation Fee Act.

## DISPOSITION

The judgment is affirmed. Palmer is awarded its costs on appeal.

Willhite, Acting P. J., and Manella, J., concurred.

A petition for a rehearing was denied August 12, 2009, and appellant's petition for review by the Supreme Court was denied October 22, 2009, S175955.