[No. B213051. Second Dist., Div. Four. Dec. 17, 2009.]

PR/JSM RIVARA LLC et al., Plaintiffs and Appellants, v.
COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS
ANGELES et al., Defendants and Respondents.

1476

COUNSEL

Jeffer, Mangels, Butler & Marmaro, Joel D. Deutsch, Matthew D. Hinks and Benjamin M. Reznik for Plaintiffs and Appellants.

Miguel A. Dager, Deputy City Attorney; Curtis S. Kidder; Meyers, Nave, Riback, Silver & Wilson, Deborah J. Fox and Dawn A. McIntosh for Defendants and Respondents.

OPINION

**SUZUKAWA, J.**—Appellants[1] petitioned for a writ of mandate to compel respondents Community Redevelopment Agency of the City of Los Angeles (agency) and City of Los Angeles (city) to set aside the September 2007 design guidelines (design guidelines) for the North Hollywood redevelopment project area (project area). The trial court denied the requested relief and entered a judgment of dismissal. Finding no error, we affirm.

## BACKGROUND

Appellants are private developers of several properties located within the project area. The project area has been subject to a community redevelopment plan since 1979 (the redevelopment plan or plan), when the original plan was approved by the agency and city under the state Community Redevelopment Law (CRL). (Health & Saf. Code, § 33000 et seq.) The redevelopment plan was amended in 1980, 1983, and 1997.

As authorized by section 629 of the plan, in September 2007, the agency adopted the design guidelines that are at issue in this litigation. Section 629 of the plan provides: "Subject to applicable State and City laws and regulations regarding Design for Development and within the limits, restrictions, and controls established in this Plan, the Agency in consultation with the PAC [project area committee] is authorized to establish floor area ratios, heights of buildings, land coverage, setback requirements, design criteria, traffic circulation, traffic access, and other development and design controls necessary for proper development of both private and public areas within the Project Area."

In December 2007, appellants filed the present action seeking to overturn the design guidelines as facially invalid on the theory that they conflict with

---

[1] Plaintiffs and appellants are: PR/JSM Rivara LLC, PR II/JSM Noho Artwalk Sub No. 1 LLC, PR II/JSM Noho Artwalk Sub No. 2 LLC, PR II/JSM Noho Artwalk Sub No. 3 LLC, PR II/JSM Noho Artwalk Sub No. 4 LLC, WCOT/JSM Cosenza LLC, JSM Capital, LLC, and JSM Construction, Inc.

applicable state and local laws. As we understand the allegations, one of appellants' main concerns is that the design guidelines have effectively "down-zoned" the maximum allowable densities of the project area's commercial core. Although appellants do not claim a vested right or entitlement to the maximum allowable densities under the zoning code, they argue that the design guidelines have effectively amended the zoning code without complying with the procedural and individualized notice requirements of the state Planning and Zoning Law, thereby rendering the zoning code inconsistent with the general plan. (Citing Gov. Code, § 65000 et seq.; *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 541 [277 Cal.Rptr. 1, 802 P.2d 317] [a zoning code that is inconsistent with the general plan is invalid when passed, and a zoning code that was originally consistent but later became inconsistent with the general plan must be brought into conformity with the general plan].)

The trial court denied the requested relief. It found by substantial evidence that because the decision to impose the disputed land use regulations was made years ago when the redevelopment plan was approved, the statute of limitations has long expired. It also disagreed that the design guidelines effectively amended the zoning code, and found the evidence insufficient to establish that the design guidelines are inconsistent with state density bonus law,[2] the city's general plan,[3] or the zoning code. Finally, the court rejected, based on both the merits and the statute of limitations defense, the allegation that the design guidelines were approved in violation of the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.) The trial court entered a judgment of dismissal from which appellants have timely appealed.[4]

---

[2] "A density bonus is an incentive, in the form of a density increase, which local governments provide in return for a developer's *voluntary* inclusion of affordable housing units within a project. (See Gov. Code, §§ 65915–65918.) The term 'density bonus' is defined in Government Code section 65915, subdivision (f) as 'a density increase over the otherwise maximum allowable residential density as of the date of application by the applicant to the city, county, or city and county. The applicant may elect to accept a lesser percentage of density bonus. The amount of density bonus to which the applicant is entitled shall vary according to the amount by which the percentage of affordable housing units exceeds the percentage established in subdivision (b).' " (*Palmer/Sixth Street Properties, L.P. v. City of Los Angeles* (2009) 175 Cal.App.4th 1396, 1402–1403, fn. 7 [96 Cal.Rptr.3d 875].)

[3] A general plan is a city or county's " ' "constitution" for future development' (*Lesher Communications, Inc. v. City of Walnut Creek*[, *supra*,] 52 Cal.3d [at p. 540] . . .) [and is] located at the top of 'the hierarchy of local government law regulating land use' (*Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1183 [203 Cal.Rptr. 401])." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773 [38 Cal.Rptr.2d 699, 889 P.2d 1019].)

[4] The trial court excluded numerous exhibits that were submitted by appellants to demonstrate the "conflicting land use regulations imposed by the City's zoning ordinances, on the one hand, and those imposed by the Design for Development [the design guidelines], on the other." Respondents have devoted a considerable portion of their brief to discussing the admissibility

# DISCUSSION

Appellants contend on appeal that (1) because the design guidelines effectively amended the zoning code: (a) the design guidelines were approved in violation of the procedural requirements of the state Planning and Zoning Law (Gov. Code, § 65000 et seq.); and (b) the zoning code no longer conforms to the general plan, which is a violation of Government Code section 65860, subdivision (a).[5] In addition, appellants assert that the design guidelines (2) conflict with state density bonus law, (3) were adopted without justification, and (4) were adopted in violation of CEQA requirements.

## I.  Standard of Review

In determining whether the administrative decision to adopt the design guidelines was consistent with applicable law, we exercise our independent judgment. (See *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361 [87 Cal.Rptr.2d 654, 981 P.2d 499].) In reviewing the trial court's factual determinations, we apply the substantial evidence standard. "The substantial evidence standard, not the independent exercise of the court's judgment, governs judicial review of the findings and determinations of an agency and legislative body in the adoption and approval of a redevelopment plan. [Citations.]" (*Fosselman's, Inc. v. City of Alhambra* (1986) 178 Cal.App.3d 806, 810–811 [224 Cal.Rptr. 361].)

## II.  California Redevelopment Law

■  In evaluating appellants' contentions, we must bear in mind the CRL's purpose of addressing problems of urban blight. As stated in *Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123 [27 Cal.Rptr.3d 675] (*Evans*), "The California Redevelopment Act was enacted in 1945 to address problems of urban blight. It provides that cities and counties can establish redevelopment agencies with the authority to acquire and sell real property, to impose land use and development controls, and to finance their operations by borrowing from federal or state governments. . . . The provisions of the California Redevelopment Act are contained in Health and Safety Code,

---

of the exhibits that were reproduced in the opening brief. Because the exhibits were not considered by the trial court, we will disregard them as irrelevant to the issues on appeal.

[5] Government Code section 65860, subdivision (a) provides: "County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974. A zoning ordinance shall be consistent with a city or county general plan only if both of the following conditions are met:

"(1) The city or county has officially adopted such a plan.

"(2) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in the plan."

section 33000 et seq., known as the California Community Redevelopment Law (CRL)." (*Id.* at p. 1131, fn. omitted.)

In *Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388, 395–396 [95 Cal.Rptr.2d 265], the court explained that a prerequisite to invoking redevelopment under the CRL is the determination that the project area is afflicted with blight.[6] The goal of addressing urban blight is the central focus of any redevelopment plan. Accordingly, the CRL empowers redevelopment agencies "to prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas in the city or county, but must act in accordance with the statutory provisions of the CRL. ([*Id.*,] §§ 33131, 33100, 33112.) A redevelopment agency is unique among public entities in

---

[6] Section 33031 of the Health and Safety Code defines the physical and economic conditions that constitute blight. It states: "(a) This subdivision describes physical conditions that cause blight: [¶] (1) Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions may be caused by serious building code violations, serious dilapidation and deterioration caused by long-term neglect, construction that is vulnerable to serious damage from seismic or geologic hazards, and faulty or inadequate water or sewer utilities. [¶] (2) Conditions that prevent or substantially hinder the viable use or capacity of buildings or lots. These conditions may be caused by buildings of substandard, defective, or obsolete design or construction given the present general plan, zoning, or other development standards. [¶] (3) Adjacent or nearby incompatible land uses that prevent the development of those parcels or other portions of the project area. [¶] (4) The existence of subdivided lots that are in multiple ownership and whose physical development has been impaired by their irregular shapes and inadequate sizes, given present general plan and zoning standards and present market conditions. [¶] (b) This subdivision describes economic conditions that cause blight: [¶] (1) Depreciated or stagnant property values. [¶] (2) Impaired property values, due in significant part, to hazardous wastes on property where the agency may be eligible to use its authority as specified in Article 12.5 (commencing with Section 33459). [¶] (3) Abnormally high business vacancies, abnormally low lease rates, or an abnormally high number of abandoned buildings. [¶] (4) A serious lack of necessary commercial facilities that are normally found in neighborhoods, including grocery stores, drug stores, and banks and other lending institutions. [¶] (5) Serious residential overcrowding that has resulted in significant public health or safety problems. As used in this paragraph, 'overcrowding' means exceeding the standard referenced in Article 5 (commencing with Section 32) of Chapter 1 of Title 25 of the California Code of Regulations. [¶] (6) An excess of bars, liquor stores, or adult-oriented businesses that has resulted in significant public health, safety, or welfare problems. [¶] (7) A high crime rate that constitutes a serious threat to the public safety and welfare."

Health and Safety Code section 33030 provides in part: "(b) A blighted area is one that contains both of the following: [¶] (1) An area that is predominantly urbanized, as that term is defined in Section 33320.1, and is an area in which the combination of conditions set forth in Section 33031 is so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community that cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment. [¶] (2) An area that is characterized by one or more conditions set forth in any paragraph of subdivision (a) of Section 33031 and one or more conditions set forth in any paragraph of subdivision (b) of Section 33031. [¶] (c) A blighted area that contains the conditions described in subdivision (b) may also be characterized by the existence of inadequate public improvements or inadequate water or sewer utilities."

that it works in conjunction with the private sector—private lenders, developers, owners and tenants—in order to achieve the goal of eliminating blight." (*Evans, supra,* 128 Cal.App.4th at p. 1131.)

■ When a redevelopment agency adopts and implements a redevelopment plan under the CRL, it is carrying out state, not local, policy. "The principle is well established that the local governing body is carrying out state policy when it acts in proceedings under the Community Redevelopment Law. As the court explained in *Gibbs* v. *City of Napa* (1976) 59 Cal.App.3d 148, 153 [130 Cal.Rptr. 382]: 'The policy question, whether a city's redevelopment agency shall function, is of a legislative nature. But when the need for the agency to function is determined, "all considerations of wisdom, policy and desirability connected with the functioning of a redevelopment plan [become] settled . . . ." The agency's acts thereafter fall "within the executive or administrative functions." And case authority makes it "clear that once the legislative policy is established . . . the administrative acts following therefrom are not subject to referendum." (*Andrews* v. *City of San Bernardino* [(1959)] 175 Cal.App.2d 459, 462–463 [346 P.2d 457] . . . .)' " (*Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 168 [143 Cal.Rptr. 633] (*City of Berkeley*).)

III. *The Design Guidelines Are Not a Zoning Ordinance Within the Meaning of the Government Code*

Appellants claim that the design guidelines "regulate the use of buildings, structures and lands within the Project Area and specify the location, height, size of lots[,] allowable density, and other matters fundamentally within the purview of the zoning laws." They assert, "there can be little question but that the Design Guidelines are patently a zoning ordinance, or an amendment to a zoning ordinance, within the meaning of the State Planning and Zoning Law." Thus, appellants allege, respondents were required to approve the guidelines in accordance with the procedures established in the state's Planning and Zoning Law. (Gov. Code, § 65000 et seq.)

Respondents contend that the design guidelines implemented the redevelopment plan and did not constitute a zoning change. Thus, they argue, the Government Code provisions do not apply. We agree.

■ Appellants fail to take into account the difference between adopting a redevelopment plan and implementing one. "The city that creates a redevelopment agency must approve a redevelopment plan for a blighted area, and adopt the plan by ordinance. ([Health & Saf. Code,] § 33365.)" (*County of Solano* v. *Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1267, [90 Cal.Rptr.2d 41].) While appellants are correct that the redevelopment

agency must find that the redevelopment plan conforms to the general plan, that determination is made prior to the *adoption* of the plan. (Health & Saf. Code, §§ 33331, 33367.) The Government Code provisions at issue apply to the adoption of zoning laws through the legislative process conducted by any county or city. (Gov. Code, §§ 65800, 65850.)

On the other hand, once the ordinance adopting the redevelopment plan is filed, "the agency is vested with the responsibility for carrying out the plan." (Health & Saf. Code, § 33372.) As we have discussed, in carrying out its responsibilities, the redevelopment agency's acts are executive or administrative in nature, not legislative. (*City of Berkeley, supra*, 80 Cal.App.3d at p. 168.) Appellants have not cited any provision of either the Government Code or the Health and Safety Code that requires a redevelopment agency to provide notice and conduct public hearings when it is performing the nonlegislative function of implementing the plan.[7]

Appellants cite *Taschner v. City Council* (1973) 31 Cal.App.3d 48 [107 Cal.Rptr. 214] in support of their claim that the Government Code zoning provisions apply to the adoption of the design guidelines. In that case, the appellate court held the city could not institute a zoning change through the initiative process[8] and had to comply with the Government Code zoning provisions requiring notice and public hearings. The court did not discuss whether a redevelopment agency was subject to those same procedural requirements. Accordingly, appellants' reliance on *Taschner* is misplaced. (See *Johnson v. Bradley* (1992) 4 Cal.4th 389, 415 [14 Cal.Rptr.2d 470, 841 P.2d 990] [cases are not authority for propositions not considered therein].) For the same reason, we distinguish the remaining cases relied on by appellants, *Richter v. Board of Supervisors* (1968) 259 Cal.App.2d 99 [66 Cal.Rptr. 52] and *Hein v. City of Daly City* (1958) 165 Cal.App.2d 401 [332 P.2d 120]. Neither involved the implementation of a redevelopment plan nor considered whether a redevelopment plan's design guidelines were a zoning ordinance within the meaning of Government Code section 65000 et seq.

---

[7] When a redevelopment agency proposes to amend the plan, notice and public hearings are required (Health & Saf. Code, §§ 33348, 33349), but appellants do not claim such an action was taken here.

[8] The *Taschner* court relied on *Hurst v. City of Burlingame* (1929) 207 Cal. 134 [277 P. 308] in reaching this conclusion. *Hurst* was overruled on this point in *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473], and *Taschner* was disapproved to the extent it relied on *Hurst* to conclude that general law cities cannot adopt zoning ordinances by initiative. (*Associated Home Builders*, at p. 596, fn. 14.)

IV. *Appellants Have Not Demonstrated That the Design Guidelines Are Inconsistent with the General Plan*

Appellants contend the design guidelines must be set aside because they are inconsistent with the city's general plan. They claim that the "[p]ermissible land uses in each and every District created by the Design Guidelines have been completely altered and are at odds with what is provided by the Community Plan," and conclude "[a]s such, the Design Guidelines are fatally inconsistent with the General Plan . . . ."

The trial court found appellants failed to cite any evidence in the administrative record demonstrating such an inconsistency. We agree with the trial court.

Government Code section 65860, subdivision (a) provides the test for determining whether a zoning ordinance is consistent with a city or county general plan. One, the city or county must have officially adopted such a plan; and two, the various land uses authorized by the ordinance must be compatible with the objectives, policies, general land uses, and programs specified in the general plan. At best, appellants have demonstrated that the provisions of the design guidelines and the general plan with respect to specific land uses are different. In their brief, they do not identify the objectives, policies, general land uses or programs specified in the general plan that are affected by the design guidelines, much less attempt to explain how the design guidelines and the general plan are inconsistent. Moreover, they do not cite the evidence in the administrative record that purports to support their contention. We conclude the trial court was correct when it determined appellants did not establish that the design guidelines and the general plan were inconsistent within the meaning of the Government Code.

V. *The Design Guidelines Do Not Conflict with State Density Bonus Law*

Appellants contend that the design guidelines facially conflict with state density bonus law in that the guidelines: (1) changed the criteria for awarding density bonuses; (2) restricted the size of the density bonus; and (3) applied the density bonus percentage to a different and lower base density. We conclude that the record fails to support these assertions.

Respondents submitted the declaration of Margarita De Escontrias, the agency's regional administrator, who attested that the design guidelines's discretionary density bonus plan will not interfere with the mandatory state density bonus plan. De Escontrias explained that the agency must first determine whether a project qualifies for a mandatory density bonus under the state density bonus law. If it does, the state-mandated density bonus is

awarded to the project and the resulting density becomes the base density for the second step of the process. The second step, which is discretionary, "generally involves discussion and coordination between the project proponent and [agency] staff to determine what community benefits will be provided as part of the project. For projects that further the goals and objectives of the Plan by including community benefits, the [agency] may authorize additional density bonuses of up to 25% of the 'base density.' (Design Guidelines Section 3B. . . .)"

Based on De Escontrias's declaration, respondents argued that the combined mandatory and discretionary density bonus plans will allow bonuses in excess of the "35% maximum provided under the Density Bonus Law while eliminating blight, preserving the stability of housing for various income levels, and rehabilitating and revitalizing the Project Area." Appellants did not present any conflicting evidence on this point.

· The trial court concluded that the evidence failed to show that the discretionary bonus plan would deprive a developer of a mandatory density bonus. The trial court stated: "[Plaintiffs'] contention that the Design for Development restricts the size of a density bonus to which a developer is entitled under 'State Density Bonus Law' has no merit. Government Code § 65915 requires a city to grant a density bonus to a developer who provides a certain percentage of affordable housing as part of the development. The Design for Development allows the City Respondents to provide additional density bonuses, over and above those density bonuses granted under Government Code § 65915, to developers who provide such things as 'variety in housing,' 'revitalization,' 'living spaces and open space to avoid excessively dense development,' and contributions 'to a desirable residential environment and long-term neighborhood stability.' State law does not prohibit cities from awarding additional density bonuses for such features. [Plaintiffs] cite no evidence that any developer will be deprived of the density bonus to which he is entitled under Government Code § 65915."

■   Appellants argue on appeal that because the state density bonus law requires the base density to be set at the ·"maximum allowable residential density" under the applicable zoning ordinance (Gov. Code, § 65915, subd. (g)), the discretionary density bonus plan is invalid because it uses a lower base density than the zoning code's maximum allowable base density. However, as respondents point out, section 12.21.3.F of the Los Angeles Municipal Code allows a redevelopment plan to impose "[a]dditional limitations on the height and/or floor area of any building or structure" and to impose limitations on density, building heights, and floor area ratios that "are lower than the maximums allowed by the Zoning Code." We conclude that because the Los Angeles Municipal Code allows a redevelopment plan to

adopt a base density that is lower than the "maximum allowable residential density" under the applicable zoning ordinance (Gov. Code, § 65915, subd. (g)), appellants have failed to show that they are entitled, as a matter of right, to the maximum allowable residential density under the zoning code. The trial court's finding that the design guidelines will not deprive a developer of a mandatory density bonus under Government Code section 65915 is supported by substantial evidence.

In any event, as the trial court found, because the agency's decision to impose the disputed land use regulations was made when the redevelopment plan was amended in 1997, the time for challenging that decision has long expired. Given that the opening brief does not challenge this factual finding, it is presumed to be correct on appeal. (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 865 [64 Cal.Rptr.2d 324] [an appealed judgment is presumed correct and the appellant has the burden of overcoming the presumption of correctness].) Accordingly, the challenge to the discretionary bonus plan based on the use of a lower base density is time-barred.

## VI. *The Design Guidelines Are Authorized by State Law*

Appellants contend that the agency cannot justify its adoption of the design guidelines. The contention lacks merit.

The CRL permits cities and counties to establish redevelopment agencies, which are authorized to address problems of urban blight by buying and selling real property, imposing land use and development controls, and financing their operations by borrowing from federal or state governments. (*Evans, supra,* 128 Cal.App.4th 1123, 1131.) In this case, section 629 of the plan authorized the agency to adopt design guidelines to implement the plan by establishing "floor area ratios, heights of buildings, land coverage, setback requirements, design criteria, traffic circulation, traffic access, and other development and design controls necessary for proper development of both private and public areas within the Project Area." Accordingly, the agency was authorized by the CRL and section 629 of the plan to develop and adopt the disputed design guidelines.[9]

## VII. *The CEQA Claim Is Time-barred*

Appellants contend that the agency adopted the design guidelines in violation of CEQA requirements. We conclude that the issue is time-barred.

---

[9] Appellants abandoned the claim raised in their opening brief that the agency failed to create and consult a project area committee prior to adopting the design guidelines after respondents pointed out the agency was required to consult with the committee for the first three years after the plan was adopted, which occurred in 1997.

The final EIR (environmental impact report) for the redevelopment plan was certified in 1995 (1995 final EIR). When the 2007 design guidelines were adopted, the agency certified a 2007 addendum to the 1995 final EIR, which stated that under the CEQA guidelines, sections 15162 and 15164 of the California Code of Regulations, title 14 (CEQA Guidelines), the design guidelines would not require a new EIR because the impacts were similar to those that were discussed in the 1995 final EIR.

Respondents argued below that the 30-day limitations period for challenging the decision to prepare the 2007 addendum had expired on November 25, 2007, which was 30 days after the notice of determination was posted on October 26, 2007. (Citing Pub. Resources Code, §§ 21167, subds. (b), (c), 21152, subds. (a), (c); CEQA Guidelines, § 15112, subd. (c)(1).)

Appellants, on the other hand, argued below that the 30-day limitations period for challenging the 2007 addendum did not commence with the posting of the notice of determination on October 26, 2007, because the notice failed to adequately describe the design guidelines.

The trial court rejected appellants' contention, stating: "[Plaintiffs'] final contention that the Notice of Determination for the Addendum to the Final EIR prepared for the Design for Development was defective because it failed to adequately describe the Design for Development has no merit. Under CEQA Guidelines § 15094[(b)](2), a Notice of Determination is required to contain only a 'brief description of the project.' The Notice of Determination for the Design for Development fully satisfies this requirement and is not inaccurate or misleading. Since the Notice of Determination was proper under CEQA, [plaintiffs'] CEQA claims are time barred."

In their opening brief, appellants do not challenge the trial court's adverse ruling on the statute of limitations defense. In their reply brief, appellants erroneously state that the trial court rejected the statute of limitations defense, and then attempt to explain why the statute did not run. We need not consider this argument, because it was made for the first time in reply without any showing of good cause for failing to raise it in the opening brief. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894–895, fn. 10 [93 Cal.Rptr.2d 364] [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before" ' "].)

The judgment is affirmed. Respondents are awarded their costs.

Willhite, Acting P. J., and Manella, J., concurred.